**NORTHEAST COMMUNITY ORGANI-ZATION, INC.**

v.

**Caspar W. WEINBERGER, United States Secretary of Health, Education and Welfare.**

**HEALTH AND WELFARE COUNCIL OF CENTRAL MARYLAND, INC.**

v.

**Caspar W. WEINBERGER, United States Secretary of Health, Education and Welfare.**

**Civ. Nos. 74–528–HM, 74–584–HM.**

United States District Court, D. Maryland.

June 24, 1974.

Michael A. Pretl, Baltimore, Md., for plaintiff Northeast Community Organization, Inc.

Benjamin R. Civiletti and Richard J. Magid, Baltimore, Md., for Plaintiff Health and Welfare Council of Central Maryland, Inc.

George Beall, U. S. Atty., Parker B. Smith, Asst. U. S. Atty. and John Behan, Dept. of Health, Education and Welfare, Philadelphia, Pa., for defendant Caspar W. Weinberger.

MURRAY, District Judge.

Northeast Community Organization, Inc. [hereinafter NECO], plaintiff in Civil No. 74–528–HM, is a non-profit corporation engaged in educational pursuits, and is one of the members of a consortium for which the Health and Welfare Council of Central Maryland, Inc. [hereinafter HWC], plaintiff in Civil No. 74–584–HM, acts as agent. Through HWC, NECO and seven other non-profit organizations making up the consortium, made application in December, 1973 to the United States Department of Health, Education and Welfare [hereinafter HEW] for grants under the Emergency School Aid Act, 20 U.S. C. § 1601 et seq. [hereinafter ESAA]. Following a complex series of administrative actions, more fully discussed below, HEW notified the president of HWC, James E. Nix, in a letter dated May 17, 1974, that its application for ESAA assistance was denied. This suit challenges the propriety of that denial.

Temporary restraining orders in these two cases have enjoined HEW from reallocating to other projects a total of $397,000.00, pending the resolution of motions for a preliminary injunction.[1] The two cases have been consolidated and lengthy hearings have been held at which testimony was taken concerning the events preceding the May 17, 1974 denial of ESAA funding. The parties have agreed that these hearings shall be treated as a trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Although not herein separately enumerated, this opinion contains such findings of fact and law as are required by Rule 52(a) and a judgment on the merits of the plaintiffs' claims.

In seeking to overturn HEW's action, NECO and HWC make two main argu-

ments. First, they assert that statements made over the telephone by various agents and employees of HEW in March and April, 1974, constituted approval of their application for ESAA funding and created a contract between HWC and HEW. Second, they assert that the denial of their application for such funding was based on an incorrect reading of the statute which made HWC's eligibility dependent on the acceptability of a desegregation plan adopted by the Baltimore City School Board. When the Baltimore plan was found unacceptable by the HEW Office of Civil Rights, the agency also ruled as a consequence that HWC was ineligible for ESAA monies.

## I.

### The Facts

Before dealing with these contentions, the background facts should be briefly stated. In June of 1954, the Baltimore City School Board responded to the Supreme Court's decision in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954) by adopting an "open enrollment plan" of desegregation. On December 22, 1973, the Baltimore City School Board submitted an application for ESAA funding as a "local educational agency" [hereinafter LEA] within the meaning of the Act. 20 U.S.C. §§ 1619 and 1605. Two days later, HWC submitted its application to HEW, proceeding as a "non-profit organization" [hereinafter NPO]. 20 U. S.C. §§ 1619 and 1607(b). On January 2, 1974, these applications were received at HEW Region III headquarters in Philadelphia, Pennsylvania, and pursuant to normal procedure were processed by the Office of Civil Rights [hereinafter OCR]. Harold Davis of that Office notified the Office of Education on the

1. NECO was initially granted a temporary restraining order by Judge Roszel C. Thomsen of this Court on May 28, 1974 and this Order also directed the plaintiff to file a cash bond in the amount of $100.00. The Order was then extended by the undersigned judge until June 17, 1974 and, after HWC was granted a temporary restraining order against the defendant until June 24, 1974, the parties consented to a further extension of the NECO order to the same date. By putting these restraints in phase, the Court is able to render a decision on these consolidated suits at the same time.

same day that both applications were in support of what OCR regarded as an acceptable plan of desegregation, namely the above-mentioned "open enrollment plan". The Office of Education then proceeded to process the HWC application through the requisite administrative procedures.

While these procedures were being pursued by HEW's Office of Education, a letter was sent on February 5, 1974 by Peter Holmes of OCR to Dr. Roland Patterson, superintendent of the Baltimore City Schools, stating that the City's "open enrollment plan" no longer complied with the standards of desegregation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d et seq.) as enunciated in Adams v. Richardson, 356 F.Supp. 92 (D.D.C.1973), affirmed en banc 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973). The same letter allowed the City thirty days in which to submit a modified plan which would satisfy Title VI. After a series of extensions, the City was ultimately given a deadline of May 30 for the submission of its plan. On June 12, 1974, a plan for further student and faculty desegregation was finally delivered to HEW and is currently under active administrative review.

Meanwhile, the Office of Education had taken several actions with regard to HWC's ESAA application. The first rounds of administrative approval were passed and on March 18, 1974 Ann Weber, acting contract officer for Region III, called HWC to inform them that certain reductions in budgetary requests must be submitted by March 20, 1974. Witnesses for the plaintiff assert that Miss Weber said the application had been "approved" at a lower level of funding than originally requested. Miss Weber, however, denies ever using such terms. At this same time, HWC was given to understand that three consortium members, including NECO, had been deleted, allegedly because their proposed activities under the plan would supplant similar activity of the LEA.

John Geist, Executive Director of HWC, and Mary Ann Martin, his assistant, called Region III on March 19, 1974 and spoke with John Rooks, a program officer in the Office of Education. In response to their request for information about the status of the HWC application, Rooks told them that he was no longer their program officer and was therefore unable to answer their inquiries. Geist and Martin assert, however, that they were informed by Rooks that the HWC proposal was "approved". Again, the HEW employee denies using that term.

On the next day, Geist and Martin spoke with a program officer named Anderson who purportedly indicated that Baltimore's application had been approved and this testimony is undisputed. The proposal with the requisite alterations was then delivered to Region III on the same day.

In the first week of April, 1974, Edward Cooper, program manager in the Office of Education, spoke with Martin and told her that new evidence indicated that the deleted members might be restored. Martin acquiesced in the suggestion that the entire HWC application be reprocessed through the administrative machinery. After this was done, the new proposal was recommended for approval and Weber again instructed HWC to submit altered budgetary figures with a telephone call on April 11, 1974. Another series of telephone calls ensued between HEW and HWC, but no testimony was offered that approval was mentioned at this time. On April 15, 1974, Weber called HWC and told them not to bother with the new figures; at that point, or soon thereafter, HWC was informed that its application was in "fiscal hold". This status apparently meant that no action could be taken until further funding information became available from within HEW. The next communication to HWC was the letter of May 17, 1974 rejecting its application for ESAA assistance.

## II.

### *Approval*

Plaintiffs argue that certain actions of Dr. Walker Agnew, Commissioner of Education for Region III, taken either prior to March 18, 1974, or at some unparticularized time toward the end of April, amount to an "acceptance" by HEW of plaintiffs' "offer" embodied in their application for assistance. Offer and acceptance assertedly created a contract, binding on the government.

Plantiffs disclaim any attempt to bind HEW through unauthorized statements or acts of its agents. Such an attempt must in any case have failed. Federal Crop Insurance Corp. v. Merrill, 332 U. S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Therefore, plaintiffs rely on the statements made to them over the telephone from HEW concerning "approval" not as legally significant on their own but as indicating that Dr. Agnew in accepting the recommendations of his staff in favor of the HWC proposal caused a binding contract to come into being between HWC and the government.

HEW contends that no contract could have come into existence without the issuance of a written notification of the grant award, signed by Dr. Agnew. Several HEW witnesses testified that such notification had in every instance in their experience accompanied an award.

Plaintiffs' argument is aided by the singular fact that there appears to be no statute or regulation requiring written notification.[2] Neither that fact nor any others in this record are enough, however, to convince this Court that a contract ever existed between HEW and HWC.

At the outset, there is no evidence whatever to support a conclusion that Dr. Agnew signified his acceptance of any offer in April; all the evidence on which HWC relies concerns the approval in March of the proposal from which NECO and two other groups had been deleted. Consequently, NECO can derive no comfort of any sort from any earlier "approval".

The evidence further shows that HWC in early April agreed that its entire proposal should be submitted to the full administrative review, indicating at the very least that any prior contract was revoked at that time. This resubmission was necessitated by the restoration to the consortium of the three members previously deleted.

■ Not even the evidence concerning the events of March permits a conclusion that a contract existed at that time. When Miss Weber called HWC on March 18, 1974, she directed that changes be made in their proposal. Plaintiffs have attempted to characterize these changes as mere detail, but elementary contract law teaches that any acceptance of an offer must be without qualification. See 1 Williston on Contracts, § 73 (3rd Ed.1957). Miss Weber's telephone call is evidence that HEW had made at most a counter-offer.

■ It is also basic contract law that an acceptance leading to a bilateral contract[3] must be communicated to the offeror. *Id.* at § 70. No evidence exists that the proper party, Dr. Agnew, made any attempt, by word or deed, to make any such communication to HWC.

In short, even if this Court were to concede that a contract could have been created in the manner plaintiffs assert,

---

2. Phrases in other regulations do carry the implication that every notification of a grant award will be in writing. *See, e. g.*, 45 CFR 74.3, defining "'terms and conditions' of a grant" as requirements that may be imposed "under the grant award document itself"; 45 CFR 185, Appendix A, which mentions the "Notification of Grant Award". However, these references do not appear to the Court sufficient to create the inference that grant awards must always be written.

3. The nature of the alleged contract is not clear. However, if a unilateral contract is argued, it is clear that the application invited the payment of money as the fulfilling act. Of course, no such payment has been made.

the evidence will not support a conclusion that one was in fact created here.

■ Finally, the testimony that grants are always awarded in writing can be accepted as showing the custom and usage within HEW. That custom would be binding on HEW, Briscoe v. Kusper, 435 F.2d 1046, 1055 (7th Cir. 1970), and ought therefore to be binding on the plaintiffs here as well. This Court consequently has no difficulty in finding that the HWC and NECO applications were never approved by HEW.

### III.

### Title VI Compliance as a Threshold to ESAA Eligibility

■ Absent an enforceable contract between HWC and HEW or an approved grant of monies from the Commissioner of Education for Region III which could trigger issues of procedural due process upon a subsequent termination, the Court must next determine whether the letter from Agnew to Nix, declaring the consortium ineligible for ESAA assistance on May 17, 1974 because of the City's failure to submit an adequate plan of desegregation pursuant to Title VI, comports with the ESAA statute or was predicated on a fundamental misconstruction of the prerequisites for funding an NPO. Since this question is one of first impression, proper analysis begins with an examination of the applicable statutory provisions. According to 20 U.S.C. § 1607(b)(1) and (2),[4] which is the source of all ESAA monies for NPOs, any grant or contract under these subsections lies in the sound discretion of the Assistant Secretary of HEW for Education as evidenced by the phrase "may assist".

■ This latitude raises the preliminary question of the propriety of judicial review over acts committed to agency discretion within the meaning of § 10(a) of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2). Although resolution of the issue is a subject of intense dispute between the Circuits, the Fourth Circuit has adopted the view of Professor Jaffe[5] that, despite the seemingly contrary provisions of § 10(a), § 10(e), 5 U.S.C. § 706, permits "a reviewing court to set aside agency action found to be an . . . abuse of discretion" even where the agency official enjoys a broad grant of authority. Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971) (Winter, J.). But the availability of review under the Administrative Procedure Act is necessarily limited to those administrative decisions which are "made without a rational explanation, inexplicably [depart] . . . from established policies or [rest] . . . on other 'considerations that Congress could not have intended to make relevant.'" Id. at 1211. See also, Adams v. Richardson, supra; Wong Wing Hang v. Immigration and Naturalization Service, 360 F.2d 715 (2nd Cir. 1966).

Here, the plaintiffs assert that the denial of ESAA funds on grounds that the City had not submitted an approved plan of faculty and student desegregation pursuant to the guidelines of Title VI constitutes such an abuse of discretion. Despite the appeal of their program and the possible merit of this contention, the Court concludes that the HWC application was not supporting either the implementation or development of a qualified plan of desegregation and was properly denied by HEW through the Commissioner of Education for Region III.

---

4. "From not more than one-half of the sums reserved pursuant to section 1604(a)(3) of this title, the Assistant Secretary, . . . may assist by grant or contract any . . . private nonprofit agency . . . or organization . . . to carry out programs or projects designed to support the development or implementation of a plan . . . or activity described in section 1605(a) . . . . ." Subsection 1607(b)(2) mirrors the above language but the money is disbursed from a different source or category of ESAA funds.

5. L. Jaffe, Judicial Control of Administrative Action 359 (1965); Compare Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) with Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964).

■ First, the previously quoted language of § 1607(b) clearly provides that assistance is only given to NPOs for "programs or projects designed to support the development or implementation of a plan, program, or activity described in section 1605(a) of this title." The referenced subsection and its attendant regulations [6] contain one of the three criteria which an LEA must satisfy before it becomes eligible for ESAA funds. More specifically, money is unavailable unless the LEA is or will be implementing one of seven "required" or "nonrequired" plans of desegregation described in § 1605(a)(1)(A)–(D).

Required plans are those undertaken pursuant to the final order of a court of the United States or any state, of a state agency, or of any other official of competent jurisdiction which eliminate segregation or reduce minority group isolation. A plan for the desegregation of students and faculty can also qualify if it is approved by the Secretary of HEW as adequate under Title VI. Four of the five remaining plans are those that an LEA can voluntarily adopt for the elimination, reduction or prevention of minority group isolation while the last encourages the enrollment of nonresident children in the district's schools to accomplish the same purposes.

■ Second, the defendant would add to the requirement of a qualified plan of desegregation the existence of an eligible LEA to operate that plan within the meaning of 20 U.S.C. section § 1605(d)(1).[7] In the Court's view, this construction of the statute is not supported by the regulations or prior expressions of congressional intent. It is apparent from CFR § 185.61(d) that an NPO can obtain assistance "regardless of whether [a] local educational agency applies for or receives assistance under the Act." This phrase demonstrates that ESAA draws a distinction between the eligibility of an LEA and an NPO and that the latter can obtain funds even if the former is ineligible so long as the LEA has a qualified plan pursuant to CFR § 185.11. Confirmation for this statutory interpretation is found in the legislative history of the Act [8] and in a comparison of the Civil Rights Act assurances required on applications by an LEA with those required from an NPO. *See* CFR § 185.63. An LEA, unlike an NPO, must state for example that it had no policy in effect after June 23, 1972 for the discriminatory assignment of faculty or students. CFR §§ 185.13(1) and 185.43.

■ Third, the Court's rejection of the defendant's broader argument does not compel the conclusion that an NPO's eligibility for assistance is unrelated to a plan of desegregation under 20 U.S.C. § 1605(a). On the contrary a funda-

---

6. C.F.R. § 185.61(d) states:
  A program . . . designed to support the implementation of a plan or project described in § 185.11 may be assisted under this subpart if the local educational agency, with respect to which the applicant proposes to carry out its program . . . is implementing such a plan . . . .

7. This subsection generally prohibits the distribution of ESAA monies to LEAs which have, after June 23, 1972, discriminated against students and faculty on the basis of race in their assignment and promotion within or without a specific school or school districts. Furthermore, it forbids any racial discrimination through the limiting of extracurricular activities or the transfer of school property to a segregated nonpublic school system. The Secretary is empowered to waive LEA ineligibility under this subsection when he receives assurances that the discriminatory practices proscribed herein, have ceased to exist. In Kelsey et al. v. Weinberger et al., 498 F.2d 701 (D.C.Cir.1974), it was held that a waiver is unavailable unless the LEA has eliminated all vestiges of past segregation. As a practical matter, an LEA must now comply with § 1605(d)(1) when it files an application for ESAA aid.

8. U.S.Code Cong. & Admin.News 1972, 92nd Congress at 2665. There, it is apparent that the House and Senate drew a distinction between an eligible plan and an ineligible LEA. The conference committee version tracks the statute by limiting the Senate provision "to grants and contracts to carry out programs designed to support the development or implementation of an eligible plan or activity." *Id.*

mental tenet of statutory interpretation states that a congressional enactment must be construed in a manner which is not constitutionally suspect. *See e. g.,* United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); *Flemming v. Nestor,* 363 U.S. 603, 80 S. Ct. 1367, 4 L.Ed.2d 1435 (1960). If ESAA is read to permit the dissemination of funds to NPOs where the LEA has neither a required plan of desegregation nor an approved Title VI or non-required plan to reduce, eliminate or prevent minority group isolation, the constitutionality of the Act becomes an open question for this Court under binding principles frequently enunciated by the Supreme Court. *See, e. g.,* Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Bradley v. School Bd., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). Although this application seeks to remedy the effect of minority group isolation in five integrated elementary schools, it is also clear that a qualified plan of desegregation guards against the funnelling of federal funds through less scrupulous NPOs to perpetuate racial discrimination forbidden by the Constitution and the Civil Rights Act of 1964.

In this case, testimony from Harold Davis indicates that the applications of

the City and HWC were submitted to support an approved plan of desegregation known as "open enrollment" which was subsequently rejected by HEW because it failed to comply with Title VI. The letters from Dr. Agnew to Dr. Patterson and Nix specifically state that ESAA funds were denied to these programs when Baltimore failed to present a qualified Title VI plan. While the Agnew letters exhibit some confusion about the eligibility of an NPO aiding a plan of desegregation under the other subsections of 1605(a), the plaintiffs have not demonstrated that "open enrollment" was offered as a nonrequired plan to reduce or eliminate minority group isolation.[9]

Finally, the plaintiffs' assertion that their program assisted the development of the plan now before HEW has no basis in fact. CFR § 185.61(d)(2) requires a request for such support from the LEA and neither side introduced evidence showing a relationship between the June 12 submission by the City and the ESAA application of HWC in late December of 1973.

■ Thus, this Court finds that the rejection of the City's "open enrollment plan" by Peter Holmes of OCR is a sufficient reason for denying ESAA assistance to HWC and NECO.[10]

---

9. Noncompliance with the guidelines of Title VI is only a basis for refusing ESAA funds to the plaintiffs and Baltimore City if their applications were founded on an approved plan of desegregation under Title VI and § 1605(a)(1)(A)(ii) or if the failure of "open enrollment" to satisfy Title VI is synonymous with both plan and LEA ineligibility under ESAA. The latter suggestion is implicit in Adams v. Richardson, *supra,* and is reinforced by continued references in ESAA to the policies of Title VI. See, 20 U.S.C. §§ 1602(b) and 1616 which incorporates the standards of 20 U.S.C. § 1231e concerning the eligibility of an LEA and the reallocation of funds. Since this decision rests on proof of the former theory, the Court need not reach the merits of the second possible grounds for Agnew's action.

10. The plaintiffs have belatedly argued that the failure of HEW to withhold its decision

on their applications until May 30 when the City was scheduled to submit a new Title VI plan of desegretation was unfair and, therefore, an abuse of discretion. Because HEW was faced with a lapse of the ESAA appropriation on June 30; § 405, P.L. 93–193 approved December 18, 1973, U.S.Code Cong. & Admin.News; 93rd Congress at 829, this Court is not prepared to say that the use of an arbitrary date after May 1 for the denial of NPO applications is an abuse of discretion. This determination comports with 20 U.S.C. § 1607(b)(2), which forbids the reapportionment of any state's allocation on any date earlier than sixty days prior to the end of the fiscal year, because HEW retained the Maryland LEA allocation until May 4, 1974 and the NPO monies until May 17, 1974. Davis testified that the NPO applications were retained for the extra days on the hope that Baltimore City would come into compliance with Title VI.