**BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NEW YORK et al., Plaintiffs,**

v.

**Joseph CALIFANO, Jr., Secretary of the Department of Health, Education and Welfare, et al., Defendants.**

No. 78–C–2135.

United States District Court, E. D. New York.

Jan. 10, 1979.

Allen G. Schwartz, Corp. Counsel of the City of New York, New York City, for plaintiffs; Joseph F. Bruno, Gregg M. Mashberg, New York City, of counsel.

Edward R. Korman, U. S. Atty., E. D. New York, Brooklyn, N. Y., Richard P. Caro, Asst. U. S. Atty., Brooklyn, N. Y., for defendants; Steven E. Obus, Asst. Regional Atty., Department of Health, Education and Welfare, Washington, D. C., of counsel.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

An application by the plaintiff, the New York City Board of Education, for 1978–79 funding under the Emergency School Aid Act (ESAA), 20 U.S.C. § 1601 *et seq.* (Supp. II 1972) has been denied by the defendant, the Department of Health, Education and Welfare (HEW) on the ground that the Board is ineligible because it "had in effect . . . [a] practice, policy or procedure" of discrimination on the basis of race in assigning teachers after June 23, 1972. 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972). The Board's request for a waiver of ineligibility, pursuant to 20 U.S.C. § 1605(d)(3) (Supp. II 1972), has also been denied on the theory that a waiver is not available until the effect of the discriminatory practice has been fully eliminated; HEW maintains that teachers must have been reassigned "so that no school is identified as intended for students of a particular race." 45 C.F.R. § 185.44(d)(3).

HEW has an unduly limited view of its statutory discretionary powers to grant a waiver. Since this misapprehension is based upon an error of law, this court has power to grant relief. 5 U.S.C. § 706. For the reasons discussed below, the matter

must be remanded for further consideration.

## I. Preceding Events

### A. Underlying Facts

An explanation of HEW's denial of the Board's application for 1978–79 funding requires some retracing of the events of the past three years.

In March of 1976 HEW's Office of Civil Rights (OCR) notified the Board that its employment practices, particularly the discriminatory methods of selection and assignment of teachers, violated laws barring discrimination in federally financed programs. 42 U.S.C. § 2000d; 20 U.S.C. § 1681. Among OCR's findings was one that the Board had "assigned teachers, assistant principals and principals in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools." *Caulfield v. Board of Ed. of City of New York*, 583 F.2d 605, 608 n. 3 (2d Cir. 1978). OCR requested a remedial plan.

An application for 1977–78 ESAA funding was filed by the Board in January, 1977. HEW denied the application because of the Board's discriminatory teacher assignment practices. OCR's findings made the Board ineligible for ESAA funding under the statute and regulations absent a waiver by HEW.

Opinions by this court and the Court of Appeals have found substantial basis for these administrative decisions. *See Board of Ed. of City Sch. Dist. Etc. v. Califano*, 584 F.2d 576 (2d Cir.), *petition for rehearing denied*, —— F.2d —— (1978); *Board of Education v. Califano*, No. 77–C–1928 (E.D.N.Y. 1977). A writ of certiorari challenging denial of 1977–78 funds is now before the Supreme Court. The Court of Appeals has stayed the transfer of the 1977–78 ESAA funds previously earmarked for the Board pending a determination by the Supreme Court.

On September 7, 1977, the Board and OCR entered into a Memorandum of Understanding detailing a plan to remedy the challenged employment practices. This Memorandum obligated the Board to promptly begin a program that would within three years eliminate the effects of the alleged discrimination in the selection or assignment of teachers and supervisors. Execution of the plan, OCR has agreed, will constitute compliance with federal statutes. The full text of the agreement is set out as an appendix to the opinion of this court in *Caulfield v. Board of Ed. of City of N. Y.*, 449 F.Supp. 1203, 1227–1230 (E.D.N.Y.1978), which describes its history in some detail.

New York City teachers, supervisors and administrators have brought two related actions challenging the implementation of the September 7 agreement. *See generally Caulfield v. Board of Ed. of City of N. Y.*, 449 F.Supp. 1203 (E.D.N.Y.1978). A procedural due process objection to the proceedings leading to development of the plan has been rejected by the Court of Appeals. *See Caulfield v. Board of Ed. of City of New York*, 583 F.2d 505 (2d Cir. 1978), *reversing Caulfield v. Board of Ed. of City of N. Y.*, 449 F.Supp. 1203 (E.D.N.Y.1978). Substantive objections to the legality and constitutionality of the plan, however, are still before this court.

The present action concerns the Board's application for 1978–79 ESAA funding. In June 1978, HEW informed the Board that it was still ineligible under the ESAA statute and regulations. This determination of ineligibility relied in large part upon the data collected in the 1976 OCR investigation that had also constituted the basis for the denial of 1977–78 ESAA funding. Reliance for the ruling was placed on 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972), and its implementing regulation, 45 C.F.R. § 185.-43(b)(2). Both trigger ineligibility upon any discriminatory hiring or assignment practice that occurs *"after June 23, 1972"* (emphasis supplied); thus, the 1975–76 data collected in the OCR investigation can constitute a basis of ineligibility for the application for 1977–78, 1978–79, and any following years.

Subsequently the Board filed an application for a waiver of ineligibility for 1978–79

funding pursuant to 20 U.S.C. § 1605 (Supp. II 1972) and its implementing regulations, 45 C.F.R. 185.43(b)(2), 185.43(d)(4) and 185.-43(d)(5). By letter dated September 28, 1978, HEW denied the application on the ground that a waiver is possible only when the effects of the discriminatory practice have been fully eliminated, that is, when teachers and supervisors have actually been reassigned "so that no school is identified as intended for students of a particular race." 45 C.F.R. § 185.44(d)(3).

## B. Procedure in this Court

This court has held hearings on applications for a temporary restraining order and preliminary injunction requiring HEW to preserve and set aside the 1978–79 ESAA funds for which the Board appeared to be eligible absent findings of discrimination. Without such a stay and injunction the funds previously set aside by HEW for the Board for the 1978–79 school year would have been reallocated to other school districts; both the City and the students in its schools would have suffered a permanent loss. Upon appropriate findings, preliminary relief was granted. The parties agreed that no oral testimony would be offered and that the application for a final injunction should be decided upon the administrative record and other documents submitted to the court.

## II. Statutory Scheme

Congress passed ESAA as Title VII of the Education Amendments of 1972. Pub. L.No.92–318, tit. VII, § 701–720, 86 Stat. 354 (1972), 20 U.S.C. §§ 1601 et seq. (Supp. II 1972). The Act provides financial assistance to local educational agencies and other eligible organizations to promote the elimination of the effects of discrimination and other minority disadvantages. 20 U.S.C. § 1601(b) (Supp. II 1972). Funding is available for a variety of enumerated activities that further these goals. 20 U.S.C. §§ 1606–1608, 1610 (Supp. II 1972). The Second Circuit has described the legislation as "a program purposefully designed 'to aid in desegregating schools and support quali-

ty integrated schools.'" *Board of Ed. of City Sch. Dist., Etc. v. Califano*, 584 F.2d 576, 578 (2d Cir. 1978), quoting S.Rep.No. 604, 92d Cong., 2d Sess. (1972).

Distribution of ESAA funds is administered by HEW's Assistant Secretary for Education. His discretion is limited both by the Act and by administrative regulations adopted pursuant to the Act by HEW's Office of Education. 45 C.F.R. § 185.01 *et seq.*, 38 Fed.Reg. 3452 (Feb. 6, 1973).

An applicant must demonstrate that it is implementing one of three types of desegregation plans: "a plan undertaken pursuant to the order of a court or other appropriate body, a plan approved by HEW as adequate under Title VI, or one of several types of voluntary plans." *Robinson v. Vollert*, 411 F.Supp. 461, 465 (S.D.Texas 1976) (summarizing 20 U.S.C. § 1605(a)). In addition to establishing eligibility, an applicant must also show that it has not become ineligible by engaging in any of the disqualifying acts, practices, policies or procedures prohibited by the statutes and regulations. 20 U.S.C. § 1605(d)(1) (Supp. II 1972); 45 C.F.R. § 185.13(1). The statutory disqualifying provision involved in this case makes ineligible any local educational agency that has in effect, after June 23, 1972, a practice, policy or procedure of discrimination in the hiring, promotion or assignment of its employees. 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972). It provides:

(d)(1) No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

. . . . .

(B) had in effect any practice, policy, or procedure which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, or otherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees of the agency (or other personnel for whom the agency has any administrative responsibility);

The accompanying administrative regulation prohibits the assignment of full time teachers "in such a manner as to identify any of such schools as intended for students of a particular race, color or national origin." It reads:

> (2) No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any other practice, policy, or procedure which results in discrimination on the basis of race, color, or national origin in the recruiting, hiring, promotion, payment, demotion, dismissal, or assignment of any of its employees (or other personnel for which such agency has any administrative responsibility), including the assignment of full-time classroom teachers to the schools of such agency in such a manner as to identify any of such schools as intended for students of a particular race, color, or national origin.

45 C.F.R. § 185.43(b)(2).

Once an applicant has been found ineligible, ESAA funds are available only if a waiver of ineligibility is granted. The Act conditions the granting of a waiver upon the cessation of the activity which led to ineligibility. There must be a:

> determination that any practice, policy, procedure or other activity resulting in ineligibility has ceased to exist, and that the applicant has given satisfactory assurance that the activities prohibited in [the subsection defining ineligibility] will not reoccur.

20 U.S.C. § 1605(d)(3) (Supp. II 1972). Promulgation of waiver regulations which "insure that any practice, policy or procedure, or other activity resulting in the ineligibility has ceased to exist or occur . . . [and] that such activities do not reoccur . . . ." is permitted by the Act. 20 U.S.C. § 1605(d)(1) (Supp. II 1972). The regulation governing the requirements for a waiver when the ineligibility resulted from the discriminatory assignment of teachers provides that no school shall be identified by race on the basis of the teachers assigned to it, and specifies allowable ranges of racial disparities.

> (3) In the case of ineligibility resulting from discriminatory assignment of teachers as prohibited by § 185.43(b)(2), such applications for waiver shall contain evidence that such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color, or national origin. Such nondiscriminatory assignments shall, in the case of a local educational agency implementing a plan described in § 185.11(a), conform to the requirements of such plan with respect to the assignment of faculty. In the case of local educational agencies not implementing such a plan, or implementing such a plan which contains no provision as to assignment of faculty, such assignments shall be made so that the proportion of minority group full-time classroom teachers at each school is between 75 per centum and 125 per centum of the proportion of such minority group teachers which exists on the faculty as a whole.

45 C.F.R. § 185.44(d)(3).

### III. Denial of the Application for a Waiver

The Board's challenge to the validity of HEW's denial of the application for a waiver of ineligibility for 1978–79 ESAA funding is the issue now before us.

### A. Statutory Text

■ HEW primarily argues from the text of the statute. Section 1605(d)(1) provides that a waiver is available only when the discriminatory "practice, policy, procedure or other activity" that created the ineligibility has "ceased to exist or occur." 20 U.S.C. § 1605(d)(1) (Supp. II 1972). The plain meaning of this language, it is urged, requires the Board to establish (1) that any past discriminatory teacher assignment practices have ceased, and (2) that the effects of such past policies have been eliminated:

> What must "cease to exist" is not only the causes but also the effects for until the effects have been sufficiently corrected, the causes cannot be said to no longer

be operative. . . . The maintenance of a discriminatory state of affairs thus also constitutes a practice, policy, procedure or activity which continues to render a district ineligible.

Supplemental Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Cross-Motion for Summary Judgment, pp. 6–7.

We reject HEW's reading of the statute. To be sure, section 1605(d)(1) requires that something have "ceased to exist" before a waiver can be granted, but the provision defines that something as the past "practice," "policy," "procedure," or "activity" of the applicant. These are all active nouns; they look to the past conduct or "intentional" non-action of the applicant, not to the present effects of that conduct. Accepting HEW's suggestion that eliminating causes also requires the elimination of all traces of effects would blur distinctions between the concepts of cause and effect. To argue that the continued existence of the effects of past discrimination alone constitutes a present policy of discrimination makes little sense in the context of this case when the applicant Board has committed itself, in the Memorandum of Understanding, to a program of eliminating those effects. A school board's inaction, in the face of knowledge of past discrimination and its effects, might itself be deemed a "policy" of intentional discrimination—for the "foreseeable consequences" of such nonaction might well be the perpetuation of discriminatory practices and effects, *Hart v. Community School Board of Education, New York School District # 21*, 512 F.2d 37, 51 (2d Cir. 1975). But we need not now determine whether such culpable inaction is present in this case—initially that is a determination for HEW to make upon remand.

Had Congress intended to condition the granting of a waiver upon the elimination of all the effects of past discrimination, it could have added a term to its enumeration of "practice," "policy," "procedure," and "activity" to convey that intent. As the language now stands, it must be read to

permit HEW to allow or deny a waiver to an applicant that has eliminated past discriminatory practices but not yet all their effects. HEW is not, of course, precluded in the exercise of its discretion to grant a waiver, from considering such factors as the time that has elapsed since adoption of the Act, the extent of the remaining effects, and the speed with which those effects are being eliminated.

### B. Legislative History

Analysis of the legislative history supports this conclusion. The debates preceding the enactment of ESAA reflect Congressional awareness that solutions to the innumerable problems accompanying desegregation often cost more than school districts can afford:

> The implementation of desegregation plans and the elimination of dual systems have drained the resources of many school districts threatening the quality of education for all children. . . . We know that there are added costs of special programs and personnel to effect segregation with the minimum possible disruption to the primary educational function of our schools. It is only fair that the Federal Government should assume part of the financial burden.

117 Cong.Rec. 5285–86, 92d Cong., 1st Sess. (1971) (remarks of Representative Fascell). Numerous educational organizations had called upon Congress for federal funding to help ease this financial strain:

> The bill recognizes that desegregation costs money. In many cases, to achieve successful desegregation or reduction or prevention of racial isolation, a school district will have to undertake new and expensive programs. . . . The Legislative Conference of National Organizations, representing the American Association of School Administrators, the Council of Chief State School Officers, the National Association of State Boards of Education, the National Congress of Parents and Teachers, the National Education Association, and the National School Boards Association, placed assistance for deseg-

regating school districts high on their list of priorities in their January 12 statement of proposal for education legislation. In this statement, they urged the Congress to pass legislation recognizing the additional costs entailed by court ordered or voluntary desegregation.

117 Cong.Rec. 511–12, 92d Cong., 1st Sess. (1971) (remarks by Representative Bell, introducing a version of the Act). Congress made this need for federal financial support of desegregation the premise of the Act in its statement of findings and purpose:

> The Congress finds that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access.

20 U.S.C. § 1601 (Supp. II 1972).

There can be no doubt that Congress expected that ESAA funds would be used to assist the process of desegregation. The committee reports contain numerous declarations that ESAA funding was intended to aid local school districts to "plan comprehensively for the elimination of racial minority group isolation in their schools. . ." H.R.Rep.No.576, p. 1, 92d Cong., 1st Sess. (1972), and to "implement plans for a variety of programs designed to end minority group isolation." S.Rep.No.604, p. 8, 92d Cong., 2d Sess. (1972). See S.Rep.No.61, p. 2, 92d Cong., 1st Sess. (1971). The Act's statement of purpose declares this same goal of funding efforts to eliminate the effects and indicia of segregation:

> The purpose of this chapter is to provide financial assistance—
>
> (1) to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools;
>
> (2) to encourage the voluntary elimination, reduction, or prevention of minority group isolation in elementary and secondary schools with substantial proportions of minority group students; and

> (3) to aid school children in overcoming the educational disadvantages of minority group isolation.

20 U.S.C. § 1601 (Supp. II 1972).

The scheme of the Act reflects the same legislative intent. The threshold requirement for eligibility for funding is the existence of an approved desegregation plan. See 20 U.S.C. § 1605 (Supp. II 1972); H.R. Rep.No.576, p. 2, 92d Cong., 1st Sess. (1972); S.Rep.No.61, p. 2, 92d Cong., 1st Sess. (1971). Funding is available to school districts voluntarily choosing to desegregate and to school districts compelled to desegregate by court or agency order—dramatically indicating that the overriding legislative goal was to support the process of desegregation, regardless of past culpability of the school district. See 20 U.S.C. § 1605 (Supp. II 1972); H.R.Rep.No.576, p. 2, 92d Cong., 1st Sess. (1972); S.Rep.No.61, p. 2, 92d Cong., 1st Sess. (1971); 117 Cong.Rec. 38485, 92d Cong., 1st Sess. (1971) (remarks of Mr. Bell, a co-sponsor of one version of the Act); 117 Cong.Rec. 38491, 92d Cong., 1st Sess. (1971).

The clear implication of this legislative history is that Congress intended, as a basic principle of the legislation, that ESAA funding be available for school districts that had not yet eliminated all the effects of past discriminatory practices. It is almost too obvious to state that this principle must be implicit in an Act that requires applicants for funding to have plans to eliminate the effects of past discriminatory policies, see 20 U.S.C. § 1605(a)(1)(A)(i) and (ii), and that directs HEW to evaluate the applications by the degree to which they will eliminate such effects. See 20 U.S.C. § 1609(c)(2) (Supp. II 1972); 20 U.S.C. § 1609(a)(7) (Supp. II 1972).

HEW contends, however, that this basic legislative intent to fund the elimination of the effects of past discriminatory practices does not apply equally to the different classifications of applicants established by the Act. Section 1605 classifies applicants for ESAA funding into three groups: (1) applicants with a "plan" satisfying the threshold eligibility requirements; (2) applicants who

have satisfied the threshold eligibility requirements but who are ineligible because they have committed one of the prohibited practices after the cut off date of June 23, 1972; and (3) ineligible applicants who have obtained a waiver of ineligibility. 20 U.S.C. § 1605 (Supp. II 1972). HEW argues that Congress intended to finance the elimination of the effects of discrimination in only those school districts that have not committed one of the prohibited practices after the cut off date; any school district involved in such a practice after that date can, it is urged, receive funding only when the effects of the past discriminatory practice have been eliminated.

■ We reject HEW's contention. The basic purpose of the Act—funding the process of desegregation—would be frustrated by attaching such critical significance to June 23, 1972. Our interpretation is that discriminatory practices after that date make ESAA funds unavailable unless the practice has ceased and a waiver is obtained so that ESAA funds can be used to eliminate the effects of past discrimination.

The date itself indicates the untenability of HEW's position. It is the date on which the provision was adopted. 20 U.S.C. § 1601, p. 559 (West 1978). No one could have predicted that date as a cut off of the power to grant a waiver. Had the date been fixed some years prospectively, the argument might make some sense since Congress might have set it as a warning that corrective action must be taken before that date or funds under ESAA would be forever barred. But no school board could have responded to the Act by shutting off discriminatory acts on less than 24 hours notice; institutions cannot be turned on and off by the flick of a switch. Schools then discriminating were not barred absolutely from ESAA funds on the same date the Act became effective. *Cf. Hazelwood School District v. United States*, 433 U.S. 299, 309, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all its employment deci-

sions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes."). Even the use of the word "waive"—"to refrain from pressing (an objection . .)" Oxford Universal Dictionary (3d ed.)—connotes forgiveness on conditions, rather than unrelenting punishment.

No substantial legislative history exists explaining the purpose of either the cut off date creating automatic ineligibility or the waiver procedure. The scraps of legislative history that do exist suggest only a recognition of the need for a safeguard procedure to ensure that ESAA funds were not channeled to school districts that continued to discriminate. *See* 117 Cong.Rec. 512, 92d Cong., 1st Sess. (1971) (remarks of Representative Bell, an introducer of the bill); 117 Cong.Rec. 10759, 92d Cong., 1st Sess. (1971) (remarks of Senator Mondale, Chairman of the Labor Committee); Hearings on H.R. 17846 before the General Subcommittee on Education of the House Committee on Education and Labor, p. 570, 91st Cong., 2d Sess. (1971); Hearings on S. 3883 before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, p. 97, 91st Cong., 2d Sess. (1971). An applicant for funding like the Board which has adopted an HEW approved Memorandum of Understanding ending past discriminatory practices and planning concrete steps to eliminate their effects poses no such danger. The implementation of the HEW approved Memorandum insures satisfaction of the legislative intent that funds be denied to school districts actively discriminating; the Memorandum initiates a program of active desegregation. Thus, the basic legislative design of funding desegregation would be best promoted by permitting HEW to exercise its discretion to grant or withhold a waiver to an applicant that has adopted a plan to eliminate the results of a past discriminatory practice that created ineligibility, is promptly, actively and in good faith carrying out that plan, but has not yet fully eliminated that practice's effects. Surely it would be anomalous, in the face of the clear Congressional desire to

fund desegregation efforts, if the statute were read to preclude any possibility of a waiver and funding to an applicant that has agreed to an HEW approved plan designed to eliminate the effects of discriminatory teacher assignments.

The legislative intent would, of course, be frustrated if an applicant could agree to a plan to end discriminatory practices, receive federal funding, and then continue those practices. This possibility poses little danger, however, since HEW retains the power to cut off funding on the ground that the past "practice" or "policy" of discrimination has not "ceased to exist" as section 1605(d)(1) requires. *Cf. Board of Education, Cincinnati v. H. E. W.*, 396 F.Supp. 203, 239 n. 22 (S.D.Ohio 1975), *rev'd in part on other grounds*, 532 F.2d 1070 (6th Cir. 1976) (suggesting that HEW could sue for injunctive relief to enforce such a plan).

C. History of the Implementing Regulation

▉▉ HEW regulation 45 C.F.R. 185.-44(d)(3) does require a waiver applicant, ineligible due to discriminatory teacher assignments, to demonstrate that the effects of such past discriminatory practices have been eliminated—i. e., that "such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color or national origin." If this regulation were even "reasonably related" to the purposes and provisions of the Act we would be constrained to enforce it. *See, e. g., Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). It is not so related. The regulation's requirement that the effects of past discriminatory practices be totally eliminated frustrates both the primary purpose of the Act and the statutory provision, 20 U.S.C. § 1605(d)(1) (Supp. II 1972), defining the standard for granting a waiver. Regulation 45 C.F.R. 185.44(d)(3) is invalid to the extent that it prevents such a waiver.

This regulation's administrative history supports the interpretation of the statutory waiver standard that we adopt. The origi-nal text of the regulation was identical to its present language. 38 Fed.Reg. 3463, 45 C.F.R. § 185.44(d)(3). On July 16, 1973, the Secretary of HEW in a notice of proposed rulemaking announced a modification of the regulation to permit waivers of ineligibility for school districts which had not yet fully rectified the effects of the pass discriminatory practices in teacher assignments. 39 Fed.Reg. 18894 (1973). The new regulation required only that school districts adopt a plan designed to eliminate all racially or ethnically identifiable schools within a reasonable time but in no event later than the two year period ending with the commencement of the 1975–76 school year. This regulation, promulgated on August 16, 1973, provided:

§ 185.44 **Waiver of ineligibility.**

· · · · ·

(d) Demotion or dismissal of minority group personnel:

· · · · ·

(3) In the case of ineligibility resulting from discriminatory assignment of teachers as prohibited by § 185.43(b)(2), such applications for waiver shall contain evidence that such agency has adopted and implemented a nondiscriminatory assignment policy. In the case of a local educational agency implementing a plan described in § 185.11(a), such evidence shall indicate that such agency is complying with the requirements of such plan with respect to the assignment of faculty. In the case of local educational agencies not implementing such a plan, or implementing such a plan which contains no provision as to assignment of faculty, such evidence shall include at a minimum:

(i) Adoption by such agency of a policy of nondiscriminatory assignment of faculty and staff members;

(ii) Determination of all faculty and staff assignments made after the date of application for waiver in a manner which does not contribute to or reinforce the racial or ethnic identifiability of any school operated by such agency;

(iii) Adoption of a plan to eliminate all full-time teaching faculties composed exclusively of members of a single racial or ethnic group no later than the end of the period for which assistance is to be awarded; and

(iv) Adoption of a plan for assignment of faculty and staff members which will eliminate all racially or ethnically identifiable faculties at schools operated by such agency within a reasonable period of time but in no event later than the commencement of the 1975–76 academic year. In the case of school districts in which the percentage of minority group members on the full-time teaching faculty is less than the percentage of minority group members in the student body, such plans shall include a plan of affirmative action to increase the percentage of minority group members on the full-time teaching faculty of such agency.

38 Fed.Reg. 21646.

The notice of proposed rulemaking declared that the original regulation requiring the elimination of the effects of past discrimination frustrated the primary purpose of the legislation by denying support to desegregating school districts in serious need of financial aid:

In the administration of the Emergency School Aid Act it was determined that in some cases major metropolitan school districts, because of their size, were unable to satisfy the requirements for eligibility or waiver contained in 45 CFR 185.-43(b)(2) and 185.44(d)(3) which deal with discrimination in faculty assignment. These districts were able to demonstrate serious need for the assistance provided by ESAA; had submitted proposals which were rated at a level which would have permitted funding but for their ineligibility; and had demonstrated a commitment to the elimination of discrimination in faculty assignment.

In order to meet the critical needs for assistance demonstrated by these districts and to allow such districts to qualify for assistance under the Act, it is proposed to amend the regulations to permit districts which are unable to alter the faculty assignment patterns within the existing time constraints a longer period in which to complete corrective action.

The proposed revision of the regulations is to amend the provision for waiver of ineligibility resulting from discrimination in faculty assignment to permit districts to show that policies of teacher assignment which resulted in ineligibility have been changed and that corrective action to eliminate the results of past discrimination in assignment is being taken through implementation of a plan which will accomplish the complete elimination of such discrimination within a prescribed time frame.

38 Fed.Reg. 18899. Responding to criticism that the modified regulation conflicted with the statutory standards, the Secretary cogently argued that section 1605(d)(1) did not require as a condition for granting a waiver the elimination of all effects of past discriminatory practices. He pointed out that the elimination of the active practice and the adoption of a plan to eliminate the effects satisfied the statutory standard:

Two commenters felt that section 706(d)(3) of the Act requires all racially identifiable faculty assignments to be eliminated before a waiver application can be approved. It should be understood that § 185.43(b)(2) permits a finding of ineligibility based upon "discrimination in assignment" (section 706(d)(1)(B) of the Act) where the assignment of full-time classroom teachers has been made in such a manner as to identify a school as intended for students of a particular race, color, or national origin, and that section 706(d)(3) requires that the practice, policy, procedure, or other activity which resulted in ineligibility must cease to exist before a waiver can be granted. The Act does not require that racially identifiable faculties be completely eliminated prior to granting a waiver. Section 185.-44(d)(3)(i) and (ii) require that an applicant for waiver adopt a policy of nondiscriminatory assignments, and that no new assignments of staff be made which contribute to or reinforce identifiability

of schools. These requirements satisfy the relevant provision of section 706(d)(3). 38 Fed.Reg. 21646.

The present language of the regulation—conflicting with the Secretary's interpretation—was adopted by HEW only after the Court of Appeals for the District of Columbia, in *Kelsey v. Weinberger,* 162 U.S.App. D.C. 159, 489 F.2d 701 (1974), held the then existing regulation invalid. As HEW explained in the subsequent notice of proposed rulemaking, *Kelsey* read section 1605(d)(1) to condition the granting of a waiver upon the elimination of the effects of past discriminatory practices:

> Section 185.44(d)(3) contains requirements for waivers of ineligibility resulting from the discriminatory assignment of teachers, as prohibited by § 185.-43(c)(2). The regulation is revised pursuant to the May 14, 1974, decision of the United States Court of Appeals for the District of Columbia in *Kelsey v. Weinberger,* and substantially restores the requirements for waiver in effect prior to the summer of 1973. Thus, an applicant for a waiver of ineligibility based on discriminatory faculty assignment must reassign faculty members to eliminate the effects of the discriminatory practice before the waiver may be approved.

40 Fed.Reg. 14167 (1975), adopted June 21, 1975, 50 Fed.Reg. 25176.

For reasons indicated below, we do not consider *Kelsey* dispositive of the issue before us. The critical observation at this point, however, is that HEW, the agency charged with administering ESAA, considered that the purposes of the Act could best be promoted by granting waivers to school districts that had eliminated discriminatory practices but had not yet eliminated all their effects. Such agency interpretations are generally entitled to great deference. *See, e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *United States v. City of Chicago,* 400 U.S. 8, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Co. v. Electricians,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

## D. Decisions by Other Courts

HEW argues that *Kelsey v. Weinberger,* 162 U.S.App.D.C. 159, 498 F.2d 701 (1974), controls the issue before us. We disagree. *Kelsey* involved a challenge to the version of regulation 45 C.F.R. § 185.44(d)(3), adopted on August 16, 1973, 38 Fed.Reg. 21646, which permitted waivers to be granted after discriminatory teacher assignment practices had been curtailed but before teachers had been reassigned to rectify the effects of the past practice. Prior to the promulgation of the regulation, HEW had declared ineligible the school districts of Los Angeles, Baltimore, Detroit, Richmond (California) and Rochester (New York); each had had discriminatory teacher assignment practices violating 20 U.S.C. § 1605(d)(1)(B) (Supp. II 1972). *See Kelsey v. Weinberger,* 363 F.Supp. 521, 521–22 (D.C.1973), *reversed,* 162 U.S.App.D.C. 159, 498 F.2d 701 (1974). When waivers were granted after the adoption of the new regulation, school children in the cities brought suit, through their parents, seeking to declare the new regulation invalid and to enjoin its operation. At the time the waivers were granted, the school districts had proposed plans to end the discriminatory teacher assignment practices gradually by assignment of new teachers without respect to race; the effects of past discrimination would not have been eliminated for many years. *See Kelsey v. Weinberger,* 162 U.S.App.D.C. 159, 164, 498 F.2d 701, 706 (1975). The Court of Appeals for the District of Columbia held that the statutory standard for granting waivers, 20 U.S.C. § 1605(d)(1), required the elimination of the effects of discriminatory practices prior to the issuance of a waiver. 498 F.2d at 711. It ruled that waivers should have been denied to the school districts involved and invalidated the newly promulgated regulation as contrary to the statutory standard. 162 U.S.App.D.C. at 169, 498 F.2d at 711.

This court is not bound by the decisions of the Court of Appeals of the District of Columbia. *See, e. g., Pan American World*

*Airways, Inc. v. C.A.B.*, 517 F.2d 734, 741 (2d Cir. 1975); *Akinin v. Phillips*, 424 F.Supp. 104 (S.D.N.Y.1976). Even if decisions of that circuit were binding, the narrow factual question presented in *Kelsey* distinguishes that case from the one here. The Board of Education of New York City has agreed to a plan requiring elimination by 1980 of the effects of discriminatory assignments of teachers. In *Kelsey*, as the Court of Appeals emphasized, the school districts had agreed only to a plan requiring reassignment through the gradual process of filling vacancies created by attrition:

> [N]one of the cities offers to undertake any involuntary redistribution of teachers presently assigned on a racial basis. Rather, they propose to rely on the gradual though inevitable process of teacher attrition to create vacancies, and upon nondiscriminatory appointment and assignment of new teachers as a means of reducing prohibited racial concentrations within the two-year time frame of the regulation. In short, instead of altering faculty setups ensuing from racially induced faculty assignments in the past, the cities will continue those assignments in effect, subject to change only by the filling of vacancies on a nonracial basis.

162 U.S.App.D.C. at 164, 498 F.2d at 706.

The plan adopted by the Board and approved by HEW arguably is designed to forthrightly correct the effects of past discriminatory practices. The plan adopted by the school districts in *Kelsey* was arguably totally inappropriate to a good faith desire to promptly eliminate the practice or effects of discrimination. Thus limited to its facts, *Kelsey* holds only that a plan to remedy the effects of past discriminatory teacher assignment practices by relying upon a nondiscriminatory policy for new teachers and vacancies does not satisfy the statutory requirements for a waiver.

Even if *Kelsey* were not distinguishable upon its facts, we would decline to adopt its statutory analysis. The Court considered its reading of ESAA compelled by constitutional principles; any interpretation of § 1605(d)(1) that allowed federal funding to

a school system that had not eradicated the effects of past discrimination, the Court reasoned, might violate equal protection principles:

> Appellees' reading of the Act's waiver provision as a license to fund school districts in which the evils of discriminatory teacher assignments remain uneradicated generates concern of constitutional proportions.
>
> We think that construction unwarrantedly exposes the Act to a severe risk of "danger of unconstitutionality," and for that reason must be shunned.

162 U.S.App.D.C. at 166, 498 F.2d at 708 (footnote omitted).

The Court's constitutional analysis offered two strands of argument; neither is compelling. The first emphasized the importance of enforcing the Supreme Court's mandate "to terminate dual school systems at once." *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). *See Bradley v. School Bd.*, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); *Griffin v. County School Bd.*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Watson v. City of Memphis*, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); *Brown v. Board of Educ.*, 349 U.S. 294, 75 S.Ct. 693, 98 L.Ed. 884 (1954); *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

■ To the extent that the Court of Appeals feared that the Supreme Court's mandate for immediate desegregation would be undercut by federal funding of school systems failing to fully desegregate, the analysis retains some vitality. Withholding funds from school districts that have failed to fully eliminate the effects of past discrimination arguably would stimulate the implementation of desegregation plans. Nonetheless, distributing funds to help further desegregation would also satisfy the Supreme Court's mandate. Congress' broad power to enforce the fourteenth amendment, *see generally* Tribe, American Constitutional Law § 5–14 (1978), allows the allocation of funds to promote good faith efforts to desegregate. Considering the often

almost intractable problems encountered in any effort to change such deeply rooted social patterns, Congress may have provided the most effective way to satisfy the Supreme Court's desegregation mandate; funding good faith efforts to desegregate may, Congress could rationally determine, be more productive than denying funds to school districts failing to eliminate immediately all traces of past discrimination.

■ The second argument in *Kelsey* emphasized the Fifth Amendment's prohibition of federal support of discriminatory practices.

Additionally, and very plainly, the Secretary's revised regulation opens the door to federal financial contributions in situations wherein local educational agencies have defaulted in the discharge of their faculty desegregation responsibilities. It cannot be gainsaid that "[a] State's constitutional obligation requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination." . . . Certainly the Fifth Amendment does not tolerate the Federal Government in an involvement with racially segregated education which the Fourteenth prohibits to the states. On the contrary, this court *en banc* has already recognized and enforced the Secretary's "general obligation not to allow federal funds to be supportive of illegal discrimination."

162 U.S.App.D.C. at 167–168, 498 F.2d at 709–10 (footnotes omitted). This argument is far less persuasive when applied to the facts presented here than to those in *Kelsey*. Characterizing a waiver applicant as having "defaulted" in its desegregation responsibilities distorts the issue; the suggestion is that the applicant continues to discriminate. Congress expressly recognized, in passing the Act, that delay in complete desegregation may be attributable to lack of skills and resources as well as to default of constitutional obligations. To be sure, the Board now needs a waiver because its past teacher assignments arguably violated

the safeguards established by the Act to prevent the distribution of funds to school systems continuing to discriminate. Yet, under the application procedures of the Act, the threshold eligibility requirement of a qualified desegregation "plan" guards against the financing of such "less scrupulous" applicants. *Northeast Community Organization, Inc. v. Weinberger,* 378 F.Supp. 1287, 1294 (D.Maryland 1974). Why should not an HEW approved plan, like the Memorandum agreed to by the Board, be considered to also provide sufficient protection against the continuation of the discriminatory practices that resulted in ineligibility and the need for a waiver?

The decisions cited in *Kelsey* stand only for the proposition that state or federal funding may not be used to support an ongoing discriminatory practice. *See Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Griffin v. County School Bd.,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). The provisions of the plans at issue in *Kelsey* raised the danger that a good faith effort to eliminate discriminatory practices and their effects was being avoided. Thus constitutional barriers to federal financial support arguably existed. Since the plan agreed to by the Board of Education of New York City does, HEW might find, represent such a good faith effort to eliminate the effects of discrimination after discrimination has ceased, the constitutional doubts suggested by *Kelsey* are not relevant.

HEW cites a second decision, *Board of Ed., Cincinnati, v. HEW,* 396 F.Supp. 203, 231 (S.D.Ohio 1975), *rev'd in part,* 532 F.2d 1072 (6th Cir. 1976), in support of its interpretation of the requirements for a waiver of ineligibility. This reliance is also misplaced. There, the plaintiff school board had apparently not raised the issue of entitlement to a waiver of ineligibility. The court's discussion of the waiver requirements was thus extraneous to the issues before it.

IV.  Conclusion

■ HEW may, but need not, grant a waiver where a plan like the New York 1977 Memorandum of Understanding has been adopted terminating all active discrimination and beginning prompt elimination of the results of past discrimination, but where the effects of past discriminatory teacher assignment have not been fully eliminated. To the extent that the regulations promulgated under the Emergency School Aid Act conflict with this interpretation of the statute, they are invalid.

Continued existence of the effects of past discriminatory teacher assignments is one factor HEW may consider in determining whether such past practices or policies have truly ceased to exist. The statutory provisions do not preclude HEW from determining that the Board is proceeding to eradicate the effects of that past discrimination in good faith and with expedition at a rate and using methods approved by HEW, and from considering such factors in deciding on the issue of waiver. Obviously the decision on waiver implies the exercise of discretion and judgment by HEW. The application for a 1978–79 waiver is remanded to HEW for further consideration.

To prevent the loss of 1978–79 ESAA funds before the validity of the original determination of ineligibility is resolved in the 1977–78 ESAA funds litigation now pending in the Supreme Court, the court grants the Board's request for an injunction mandating that HEW preserve and set aside the 1978–79 ESAA funds which the Board would have received were it not for the determination of ineligibility and denial of the application for a waiver. This portion of the injunction shall be valid pending a final judicial determination of the validity of HEW's denial of the Board's 1977–78 and 1978–79 ESAA applications.

So ordered.