622 F.2d 599
 BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY
OF NEW YORK and Frank Macchiarola, Chancellor of
the City School District of the City of
New York, Plaintiffs-Appellees,
v.
Patricia R. HARRIS, Secretary, United States Department of
Health, Education and Welfare, Herman B. Goldberg, Associate
Commissioner, Equal Education Opportunity Programs, United
States Department of Health, Education and Welfare, and
David S. Tatel, Office for Civil Rights, United States
Department of Health, Education and Welfare, Defendants-Appellants.
 No. 1079, Docket 79-6006.
 United States Court of Appeals,
Second Circuit.
 Argued June 5, 1979.
Decided Nov. 19, 1979.
Rehearing and Rehearing En Banc Denied May 19, 1980.
 
 Richard P. Caro, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., Lois Hochhauser, Dept. of Health, Education and Welfare, Washington, D.C., of counsel), for defendants-appellants.
 Joseph F. Bruno, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel for the City of New York, Gregg M. Mashberg, Ellen B. Fishman, New York City, of counsel), for plaintiffs-appellees.
 Before OAKES and MESKILL, Circuit Judges, and STEWART, District Judge.*
 MESKILL, Circuit Judge:
 
 
 1
 Three officials of the Department of Health, Education and Welfare (collectively "HEW," the "agency," or "appellant") including the Secretary[1] appeal from an order of the United States District Court for the Eastern District of New York remanding for further administrative review the application of the Board of Education of the City School District of the City of New York (the "Central Board") for a waiver of ineligibility under the Emergency School Aid Act, 20 U.S.C. §§ 1601, et seq.,[2] and enjoining the appellant from expending funds originally designated for appellees' benefit pending such reconsideration. Previously, the Central Board had been denied funding under the program on the ground that the Central Board's assignment of black teachers to predominantly black high schools disqualified it from receiving such benefits, see 20 U.S.C. § 1605(d)(1)(B). An application for a waiver of ineligibility was summarily denied on the ground that the agency lacked discretion to grant such relief in situations where although the segregative assignment policy had been repudiated, its "effects" still lingered. In reviewing the agency's action, the district judge found that HEW had been entirely too modest in its view of its prerogatives under the waiver provisions of the Act and ordered the matter remanded for administrative reconsideration of the merits of the Central Board's application. Board of Education of the City School District of the City of New York v. Califano, 464 F.Supp. 1114 (E.D.N.Y.1979) ("Califano II "). We affirm.
 
 I.
 BACKGROUND
 
 2
 The instant appeal poses a very circumscribed issue. In substance, we are called upon to decide whether HEW's summary rejection of the Central Board's waiver application on the ground that the "effects" of the now-repudiated discriminatory practice had not yet been entirely abated was proper under the program's statutes and regulations. Before formulating a response, it is necessary to place this appeal in its proper setting which, owing to the volume of litigation which has preceded it, is panoramic.
 
 
 3
 a. The ESAA Waiver Provision and Its Implementing Regulation.
 
 
 4
 Recognizing that the cost of desegregating public school systems or of maintaining adequate educational standards in those schools which had achieved integration was beyond the means of many local boards, Congress in 1972, after considerable debate, passed Title VII of the Education Amendments of 1972, the Emergency School Aid Act ("ESAA"), Pub.L. 92-318, Title VII, §§ 701-820, 86 Stat. 354 (1972), 20 U.S.C. §§ 1601, et seq. The announced purposes of the legislation are "(1) to meet the special needs incident to the elimination of minority group segregation . . . (2) to encourage the voluntary elimination . . . of minority group isolation . . . and (3) to aid school children in overcoming the educational disadvantages of minority group isolation." 20 U.S.C. § 1601(b). This Court has previously characterized ESAA as "a program purposefully designed 'to aid in desegregating schools and support quality integrated schools.' " Board of Education of the City School District of the City of New York v. Califano, 584 F.2d 576, 578 (2d Cir. 1978), cert. granted, 440 U.S. 905, 99 S.Ct. 1211, 59 L.Ed.2d 453 (1979) ("Califano I ").[3]
 
 
 5
 Funding under ESAA is available on a competitive basis. Applicants must submit timely proposals which are reviewed and ranked by the Assistant Secretary in accordance with the criteria set forth in agency regulations, 45 C.F.R. § 185.14, the most important of which is "the effective net reduction in minority group isolation." Id. § 185.14(a)(2)(i). See also Califano I, supra, 584 F.2d at 579 n.4. A local board whose proposal is deemed meritorious must be in the active process of desegregation, whether by mandatory court order, HEW-approved plan or voluntarily adopted procedure, 20 U.S.C. § 1605(a), and in addition, must demonstrate that subsequent to the date of ESAA's passage, June 23, 1972, it has not engaged in any of the acts, practices, policies or procedures proscribed under 20 U.S.C. § 1605(d)(1). Specifically included as a category of disqualifying conduct is discrimination in the "hiring, promotion, or assignment of employees . . ." Id. § 1605(d)(1)(B). See generally Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This statutory prohibition is amplified in the regulation promulgated thereunder, 45 C.F.R. § 185.43(b)(2), which provides in pertinent part:
 
 
 6
 No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any other practice, policy, or procedure which results in discrimination . . . including the assignment of full-time classroom teachers to the schools of such agency in such a manner as to identify any of such schools as intended for students of a particular race, color, or national origin.
 
 
 7
 Even though an applicant has been disqualified from the program by virtue of the commission of proscribed activity postdating June 23, 1972, it may nonetheless receive ESAA funds if it can obtain a waiver of ineligibility under 20 U.S.C. § 1605(d)(1). That provision requires the applicant to specify the reason for its exclusion from the program, and set forth such assurances as the Secretary may require to demonstrate that the disqualifying "practice, policy, procedure or other activity . . . has ceased to exist or occur," and that such activities will not reoccur after submission of the application. Although the legislative history is scant, Section 1605(d)(1) appears to have been adopted as a safeguard against the channeling of ESAA funds to any school district whose desegregation plan was a sham or was in danger of being abandoned or flouted. See Califano II, supra, 464 F.Supp. at 1121 and legislative history cited therein. In aid of this purpose the statute further provides that the Secretary may not delegate the duty of determining the adequacy of waiver applications, 20 U.S.C. § 1605(d)(2), that such applications must conform to the regulations promulgated thereunder, 20 U.S.C. § 1605(d)(5), that relevant committees in both houses of Congress shall be notified of the Secretary's favorable review of such applications, and that final approvals thereof will not formally be granted until 15 days after Congress receives this notification, 20 U.S.C. § 1605(d)(6).
 
 
 8
 With regard to the waiver of ineligibility stemming from discrimination in teacher assignments, the regulations provide, 45 C.F.R. § 185.44(d)(3):
 
 
 9
 applications for waiver shall contain evidence that such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color, or national origin.
 
 
 10
 b. The Central Board's Attempts to Obtain ESAA Funding.
 
 
 11
 In November, 1976, HEW's Office of Civil Rights notified the Central Board that its employment practices were in violation of laws barring discrimination in federally funded programs, 42 U.S.C. § 2000d and 20 U.S.C. § 1681, in that the agency's statistical data indicated that a pattern existed whereby teachers of minority group backgrounds were consistently assigned to schools whose student populations were predominantly of similar racial or ethnic origin.[4] When the Central Board applied for a 1977-78 ESAA grant, HEW, although finding one proposal worthy of funding, denied the appropriation since its figures demonstrated that some schools were identifiable on the basis of segregative teacher assignments. The Central Board attributed the pattern to (1) provisions of the collective bargaining agreement between the Central Board and the teachers' union restricting the inter-school transfer of some teachers; (2) the preference of senior teachers for assignment to nonminority schools, together with their unwillingness to teach elsewhere; and (3) the unequal distribution of teaching licenses in specific areas. In the ensuing litigation, this Court held the ESAA funds could be properly withheld upon a simple showing that the assignment method had a disparate impact upon different groups, despite the absence of proof that the discriminatory deployment was willful or intentional which would be required to support a finding that the Central Board's teacher assignment practices violated the Constitution. Califano I, supra.
 
 
 12
 On September 7, 1977, the Central Board and HEW entered into a detailed plan, entitled the "Memorandum of Understanding," see Caulfield v. Board of Education of the City of New York, 449 F.Supp. 1203, 1227 (E.D.N.Y.) ("Caulfield I "), rev'd, 583 F.2d 605, 607 n.2 (2d Cir. 1978), aimed inter alia at rectifying the objectionable mode of teacher assignments. Pursuant to this agreement, the Central Board undertook to phase out the practice over a three year period, in exchange for which, HEW's Office of Civil Rights warranted that the Central Board would be in compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-86.
 
 
 13
 Implementation of the plan was hampered from the outset by individual teachers and principals and their unions. It appears that while teacher and principal assignments are, as a technical matter, made on an annual basis, certain collective bargaining agreements guarantee personnel with some degree of seniority placement in the schools where they have previously served. Claiming that the Memorandum of Understanding mandated the assignment of teachers to particular schools solely on the basis of race, several teachers and principals commenced legal action. On March 15, 1978, the district court, while not reaching plaintiffs' substantive claim, nonetheless found an abuse of plaintiffs' procedural due process rights to participate in the negotiations which had led up to the drafting of the desegregation plan, and vacated the Memorandum of Understanding, thereby halting its implementation, Caulfield I, supra. Approximately six weeks thereafter, the Central Board informed HEW that it would, for the present, be unable to fulfill its objective of correcting the prior pattern of discriminatory teacher assignments. For this reason, the Central Board's request for ESAA funding for 1978-79 was denied on June 20, 1978. An application for a waiver of ineligibility, which has become the subject of this appeal, was filed on July 7, 1978.
 
 
 14
 On September 5, 1978, this Court reversed Caulfield I, supra, reinstating the Memorandum of Understanding, and permitting the Central Board to renew immediately its corrective measures.[5] Despite the revival of the desegregation plan, HEW on September 26, 1978, informed the Central Board that its waiver application had been denied for the reason that the agency lacked evidence that the prior mode of teacher assignment had ceased and would not reoccur.
 
 
 15
 c. The Proceedings Below.
 
 
 16
 Claiming that the summary rejection of its waiver application was an abuse of discretion, and seeking to enjoin the expenditure of $2.36 million in ESAA grants earmarked for it for the 1978-79 school year, the Central Board once again sought the intervention of the district court. A temporary restraining order, issued on September 27, 1978, was converted into a preliminary injunction on October 10 of that year. An expedited trial on the merits was scheduled for November 8 but both parties declined the opportunity to present oral testimony, preferring to submit the matter upon the pleadings, the administrative record and certain stipulated facts.
 
 
 17
 HEW took the stance that although no further impediment to the full implementation of the Memorandum of Understanding existed, it had properly denied the waiver application because both the statute, 20 U.S.C. § 1605(d)(1), and its implementing regulation, 45 C.F.R. § 185.44(d)(3), require that the waiver applicant alleviate both the cause and the remaining "effects" of prior discriminatory teacher assignments in order to qualify for ESAA funds. The district court upheld the agency's determination that the Central Board was ineligible for direct ESAA funding by virtue of discriminatory behavior postdating June 23, 1972. However, the court rejected HEW's contention that its option to grant a waiver was foreclosed because, in the agency's view, the waiver statute and relevant regulation require not only that the applicant have desisted from the proscribed activity, but also, in the case of segregative teacher assignments, that the applicant have fully eliminated the effects of the prior misconduct. After a canvass of the legislative history and a close analysis of congressional purpose, Judge Weinstein found that such was not the intent of the waiver statute. While he agreed that the regulation demanded that the waiver applicant cure both the cause and effect of past actions, he found the provision invalid as contrary to the legislation's objectives. Accordingly, he remanded the waiver application to the agency for reassessment on its merits, clearly indicating that evidence of the Central Board's backsliding, bad faith, or simple failure to implement the teacher assignment reforms on schedule could be considered as bearing upon the likelihood that the discriminatory practice might reoccur, and explicitly leaving the ultimate resolution of the application to the sound discretion of the Secretary. Califano II, supra, 464 F.Supp. at 1127. This appeal followed.
 
 II.
 JURISDICTION AND THE PROPRIETY OF ITS EXERCISE
 
 18
 a. Waiver of Objection and Primary Agency Jurisdiction.
 
 
 19
 As a preliminary matter, we must determine whether the district court properly entertained this action. Appellants claim that by failing to advocate the position while the matter was still under administrative study, the Central Board "waived" its right to challenge, under the theory ultimately adopted by the court below, HEW's denial of their waiver application.
 
 
 20
 It is true that as a general rule subject only to certain narrowly drawn exceptions, courts will not review objections to an agency's procedures not raised at the administrative level, United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); NLRB v. Newton-New Haven Co., 506 F.2d 1035, 1038 (2d Cir. 1974); KFC National Management Corp. v. NLRB, 497 F.2d 298, 300 n.1 (2d Cir. 1974), cert. denied, 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976). However, the theory that the implementation of the Memorandum of Understanding absolved the Central Board of its current discriminatory teacher assignments could not have been raised prior to September 5, 1978, the date on which this Court resurrected the plan, by which time the waiver of ineligibility application had already been pending before HEW for two months. Moreover, there is some evidence to suggest that the agency did in fact weigh the prospect of the Memorandum's revival before finally denying the application. In its letter of September 28, 1978, formally notifying the Central Board of its action, HEW indicated that its unfavorable action might in some degree be attributed to its belief that the desegregation plan, even if implemented, was insufficient compliance with the nondiscrimination requirements of the ESAA program. Thus, it seems that the theory was not in fact "waived" in any meaningful sense.
 
 
 21
 Apart from the factual infirmities of the contention, the notion of "waiver of objection" is inappropriate to the circumstances of this case. That concept is applicable where a petitioner before an agency belatedly seeks to challenge a procedure employed by the administrative tribunal, see, e. g., KFC National Management Corp. v. NLRB, supra; NLRB v. Newton-New Haven Co., supra (Court of Appeals refuses to allow unsuccessful petitioner to challenge, for the first time, the composition of the agency's reviewing panel). What is involved here, however, is not an objection to the manner in which the agency has proceeded, or a claim which has been unjustifiably withheld from its review, but a question of the interpretation of the statute which regulates the appellees' access to the administrative review process itself. The essential issue is not one of waiver of objection or deliberate by-pass of a claim or theory before the agency tribunal. The essential issue is whether the courts or HEW should be given the first opportunity to construe the statute. Thus the controversy actually centers on whether, under the doctrine of primary agency jurisdiction, the district court should have stayed its hand in deference to HEW.[6]
 
 
 22
 Primary agency jurisdiction is a flexible concept, concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties," Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), quoting United States v. Western Pacific R. Co., 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). It is called into play when a court, having unquestioned jurisdiction over a case involving matters governed by an administrative agency, determines which tribunal should make the initial adjudication, United States v. Philadelphia National Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (Court's jurisdiction not ousted, but only postponed). The exercise of the court's discretion is guided in this situation by a desire for uniformity of regulation and the need for initial consideration by a body possessing special expertise in the issue presented. U.S. Tour Operators Ass'n v. Trans World Airlines, Inc., 556 F.2d 126, 130 (2d Cir. 1977); Danna v. Air France, 463 F.2d 407, 412 (2d Cir. 1972).
 
 
 23
 Although we do not in any sense disparage this salutary doctrine, its underlying policies would not be served by its application in the instant case. Both parties, perceiving the issue presented as a purely legal one, abjured the district judge's invitation to present oral testimony and submitted the matter upon a stipulated set of facts and upon their respective briefs. It is well established that the courts need not defer to an agency where the issue involved is a strictly legal one, involving neither the agency's particular expertise nor its fact finding prowess. FTC v. Feldman, 532 F.2d 1092, 1096 (7th Cir. 1976); cf. McKart v. United States, 395 U.S. 185, 198, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).
 
 
 24
 Moreover, it has been recognized that where resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its "special competence" in a manner hostile to petitioner, courts need not bow to the primary jurisdiction of the administrative body. See, e. g., ICC v. Maine Central R. Co., 505 F.2d 590, 594 (2d Cir. 1974); CAB v. Aeromatic Travel Corp., 489 F.2d 251, 254 (2d Cir. 1974); see also Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle, 571 F.2d 359, 363-64 (7th Cir. 1978), cert. denied, 439 U.S. 834, 99 S.Ct. 115 (1978). Such is the case here, for at no time prior to appeal has HEW given the slightest inkling that, if asked to review the waiver application in light of the reinstatement of the Memorandum of Understanding, it would consider the matter afresh. On the contrary, without itself having raised the issue of "waiver of objection" below, HEW fully briefed and hotly contested the issue on appeal. Elsewhere in the brief it submitted to this Court HEW has challenged the propriety of the district court's issuance of injunctive relief on the ground that there was no likelihood that the Central Board would persuade HEW to alter its determination to deny the waiver of ineligibility. It ill behooves appellant under these circumstances and at this stage of the proceedings to claim that the court below erred in adjudicating the merits of the case.
 
 
 25
 b. "Effects" and Estoppel.
 
 
 26
 Having determined that the district court properly exercised jurisdiction over this matter, we are nevertheless reluctant to adjudicate on the merits the contested questions of statutory interpretation. Our apprehension stems from an uneasy sense that the principal issue framed by the facts of this case has been artfully avoided. This issue is whether HEW, having induced and acquiesced in the Memorandum of Understanding, may now assert that its effectuation constitutes insufficient compliance with federal nondiscrimination requirements to permit the Central Board to participate in the ESAA program.
 
 
 27
 HEW urges that 20 U.S.C. § 1605(d)(1) requires convincing proof that a waiver applicant has alleviated the "effects" of its prior conduct. Yet nowhere in its briefs or argument has HEW defined the term "effects." Upon examination the term appears to refer simply to the continued discriminatory deployment of teachers, specifically contemplated by the Memorandum of Understanding as a temporary but necessary stage in the gradual phase-out of improper methods of teacher assignment. Thus, when all is said and done, HEW's view is quite simply that notwithstanding its approval of the Memorandum of Understanding, its warranty that the adoption and effectuation of the agreement would constitute compliance with Title VI of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972, and the Central Board's partial performance thereof, the Central Board is not entitled to a waiver of ineligibility during the interim period.
 
 
 28
 While the estoppel issue looms shadowlike over these proceedings, we choose to rest our decision upon other grounds for several reasons. First, although the historic barriers to the imposition of an estoppel against the United States, see United States v. San Francisco, 310 U.S. 16, 32, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), quoting Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226-27, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), have recently been breached in at least one jurisdiction, see, e. g., United States v. Lazy FC Ranch, 481 F.2d 985 (9th Cir. 1973); Brandt v. Hickel, 427 F.2d 53 (9th Cir. 1970), the law in this Circuit is unsettled, compare Corniel-Rodriguez v. INS, 532 F.2d 301, 306-7 (2d Cir. 1976) (government estopped in deportation proceeding due to its employee's noncompliance with affirmatively required duty) with Goldberg v. Weinberger, 546 F.2d 477, 480-81 (2d Cir. 1976), cert. denied, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977) (estoppel will not lie against government due to unauthorized misrepresentation made by agency employee). See also REA Express, Inc. v. United States, 568 F.2d 940, 948-49 n.10 (2d Cir. 1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978) ("highly dubious" that government agency can be equitably estopped). Second, the parties have not addressed this issue, and on the basis of the record before us we are unable to determine with certainty that the requisite elements of an estoppel have been satisfied.[7] Lastly, we are in accord with the result reached by the court below. Therefore, rather than striking out on this inviting though uncharted course, we proceed to the merits of the case as articulated by the parties.
 
 III.
 INTERPRETATION OF THE ESAA WAIVER PROVISION
 
 29
 Putting these reservations to one side and proceeding on the assumption that appellant may complain of the Central Board's system of teacher assignments during the three year phase-in period, or alternatively, that there continue to exist unspecified, detrimental "effects" of the prior practice, we must next consider the validity of HEW's contention that such failings disqualify the Central Board from obtaining a waiver of ineligibility under 20 U.S.C. § 1605(d)(1).
 
 
 30
 a. Statutory Text.
 
 
 31
 "(T)he starting point in every case involving construction of a statute is the language itself." Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978), quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Section 1605(d)(1) in pertinent part provides:
 
 
 32
 in the case of any local educational agency which is ineligible for assistance by reason of (the commission of certain discriminatory acts), such agency may make application for a waiver of ineligibility, which application shall specify the reason for its ineligibility, contain such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur and include such provisions as are necessary to insure that such activities do not reoccur after the submission of the application.
 
 
 33
 Appellant interprets this language to require that a waiver applicant not only demonstrate that it has desisted from its discriminatory activity, but also show that it has fully eradicated the vestiges of its past misconduct. HEW reasons that if the effects are still present, the cause must be extant, and if the cause is still operative, the applicant is perforce in violation of the statute's ban on current segregative activity.
 
 
 34
 However, the statute clearly states that what must cease to exist or occur is the practice, policy, procedure or other activity which has resulted in the applicant's ineligibility. There is simply no indication in the text that the residue of past misconduct must also be eliminated, although Congress could certainly have made that an express condition, had such been its intent. "(W) hen words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn . . . from any extraneous source." Caminetti v. United States, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917); see also Tennessee Valley Authority v. Hill, 437 U.S. 153, 173 n. 18, 98 S.Ct. 2279, n.18, 57 L.Ed.2d 117 (1978); New York State Commission on Cable Television v. FCC, 571 F.2d 95, 100 (2d Cir.), cert. denied, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978) (Friendly, J., dissenting) ("we have not quite reached the Humpty Dumpty era where a word 'means just what I choose it to mean, neither more nor less.' ")
 
 
 35
 Moreover, the listing of the operative words, "policy," "practice," "procedure" and "other activity," may provide some insight into Congress' intent. While the latter three are ambiguous the term "policy" connotes conscious, institutional decision-making, or adoption of a future goal and the intention to achieve it through deliberate steps. It is opposed to mere drift or acquiescence in the present state of affairs. This meaning reflects upon the other terms, for words grouped together derive meaning from one another, Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). What must cease to exist or occur in order for an applicant to qualify for a waiver of ineligibility is its current acceptance of the status quo. It would seem therefore, that if the Central Board has adopted a policy of eliminating discrimination in a manner approved by HEW, as demonstrated by its commitment to the Memorandum of Understanding, then "practices," "procedures" and "other activities," undertaken in furtherance of that policy cannot logically be described as having resulted in the ineligibility. Simply put, they are not part of the problem, but part of the cure. The fact that the Central Board must tolerate segregative teacher assignments until the plan is fully implemented does not, under the language of the statute, preclude it from participation in ESAA. There is nothing in the statute's language which supports a contrary reading. Where the literal meaning of a statute is clear in its context, and where such a plain reading is not inconsistent with the scheme's objectives, that interpretation must prevail, and further inquiry may be unnecessary. Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); In re Trans-Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), quoting CIR v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Although this alone would be sufficient ground on which to reject appellant's construction there are other reasons supporting the same result.
 
 
 36
 b. Legislative History.
 
 
 37
 Two other courts have reviewed the legislative history of 20 U.S.C. § 1605(d) (1), and their research has yielded no clues as to Congress' views on the question now before us, see Kelsey v. Weinberger, 162 U.S.App.D.C. 159, 165, 166, 498 F.2d 701, 707, 708 (D.C.Cir.1974); Califano II, supra. 464 F.Supp. at 1121-22. From what is available, it can be deduced only that Congress wished to ensure that ESAA grants not be distributed to school districts which had reverted to or continued to engage in proscribed segregative activity, and that this resolve was embodied in section 1605(d)'s explicit requirements that waiver candidates (1) demonstrably have ceased their disqualifying activity, (2) provide acceptable assurances that such conduct will not reoccur, and (3) have their applications reviewed at the highest administrative level and, if acted upon favorably, subjected to congressional oversight. We have scanned the legislative history[8] relevant to the waiver statute and have found nothing to indicate that its drafters intended to establish additional safeguards such as the remedy of the effects of past malfeasance.
 
 
 38
 To support its contrary interpretation, HEW cites certain circumstances surrounding ESAA's enactment. In particular, it is noted that the operation of a forerunner program to ESAA[9] was marred by its distribution of funds to school districts later found to have been engaging in discriminatory practices. Noting that Congress' ire had been aroused by this failing, see, e. g., 117 Cong.Rec. 10759, 92d Cong., 1st Sess. (1971) (remarks of Sen. Mondale), appellant argues that ESAA's drafters intended to place an additional burden on those who, in disregard of the law, discriminated after the date of ESAA's enactment. HEW asserts that Congress meant for these defiant applicants to be banned from the program unless they did an additional penance, namely, the eradication of the effects of their recent misconduct.
 
 
 39
 This scenario seems improbable, for several reasons. First, it is unsubstantiated by the legislative history. The passages cited by appellant simply do not evince an intent on the part of the Congress to be especially punitive towards post-enactment discriminators. While the statements alluded to by HEW convey Congress' concern over the wrongful appropriation of funds to school districts which had either resumed discriminatory activities or which had never departed from them, they do not indicate that in order to solve the problem, Congress meant to bar from waiver eligibility those applicants which had not eradicated the effects of this recent malfeasance. Rather, the approach seems to have been to add the administrative and congressional safeguards noted above.
 
 
 40
 Second, we agree with the court below that HEW's interpretation is belied by the prominence it gives to June 23, 1972 the date of the Act's passage in determining the widely different requirements which candidates must satisfy in order to obtain ESAA funds. Under appellant's construction, this date serves as a River Acheron, separating those who by virtue of post-1972 discrimination are almost certainly condemned to perpetual rejection, and those who may enjoy ESAA's benefits because they ceased their disqualifying conduct prior to that fateful day. Yet for all the significance HEW attaches to the precise time of the Act's passage, that date was in reality entirely fortuitous. Had Congress truly intended to warn school districts that segregative practices beyond a certain date would result in virtually incurable ineligibility for ESAA benefits, they would have set that date for some time in the future, giving school boards time in which to reform themselves. As Judge Weinstein aptly noted:
 
 
 41
 No one could have predicted that date as a cut off of the power to grant a waiver. Had the date been fixed some years prospectively, the argument might make some sense since Congress might have set it as a warning that corrective action must be taken before that date or funds under ESAA would be forever barred. But no school board could have responded to the Act by shutting off discriminatory acts on less than 24 hours notice; institutions cannot be turned on and off by the flick of a switch.
 
 
 42
 Califano II, supra, 464 F.Supp. at 1121.
 
 
 43
 c. Legislative Objectives.
 
 
 44
 Indisputably, today's choice between conflicting statutory interpretations will have broad consequences for the administration of an important federal program. Mindful that our function is to construe, not rewrite legislation, United Steelworkers of America v. Weber, 443 U.S. 193, 219, 99 S.Ct. 2721, 2736, 61 L.Ed.2d 480 (1979) (Rehnquist, J. dissenting), we seek to discover Congress' intent and to decide which of the two proffered interpretations is more likely to further the announced objectives of the legislation. We conclude that the Central Board's understanding will more probably fulfill the goals of ESAA.
 
 
 45
 Congress clearly intended that school districts which had discriminated after June 23, 1972, not be irrevocably barred from participation in the ESAA program. Otherwise, the list of eligible applicants, as a practical matter, would have been forever frozen on the date of ESAA's enactment. School districts which had truly ceased segregative activity that had been practiced subsequent to the program's passage would have been permanently denied federal funding despite their good intentions and despite their potential benefit. Indeed, thus interpreted, the program would fail to provide any incentive to integrate in the case of school districts found to have been engaged in proscribed segregative activity after 1972.
 
 
 46
 Additionally, the drafters might have recognized that the concept of discrimination itself is constantly undergoing revision. If such was their perception, it has been validated. Some parties considered by a lower court to be discriminators have later been exonerated by the Supreme Court. See, e. g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Conversely, some who might have been considered within the law as it stood on the date of ESAA's passage have now been deemed violators. Cf. Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The evolving contours of the concept of discrimination plainly warranted the adoption in the ESAA program of a provision giving its administrators the flexibility to deal with these developments.
 
 
 47
 Were we to read into the statute the requirement that a waiver applicant eradicate the "effects" of prior segregation, we would render that necessary section, in operation, a nullity. First, the notion of "effects" is simply too elusive and subjective; in a real sense, a complete cure may not be possible, for the consequences of past segregation may be viewed by the agency as lingering for a generation, or longer. Cf. Debra P. v. Turlington, 474 F.Supp. 244 (M.D.Fla.1979) (functional literacy test, made prerequisite to granting of high school diploma enjoined for four year period since many black students had attended segregated schools and were therefore disadvantaged). No school district, however genuine its reforming zeal, could be certain that it had satisfied that condition, and the Secretary might find such a determination far more difficult than predicting whether an applicant was apt to revert to prior prohibited practices or policies. Second, HEW's interpretation does not indicate whether the effects which must be eradicated are only those which flow from the proscribed post-1972 activity, or all effects from whatever cause. If appellants opt for the former, such an interpretation would kindle irresolvable debate over which effect to attribute to which activity; if the latter, it may place at a severe disadvantage those school districts with a long history of de jure segregation contrary to ESAA's insistence on a single national standard for the distribution of these federal funds. 20 U.S.C. § 1602.[10]
 
 
 48
 More importantly, an applicant who could satisfy that burden would thereby dramatically demonstrate its lack of need for an ESAA grant under the program's own competitive criteria. As previously noted, in judging which of the numerous proposals are the most meritorious, the key factor, to put it succinctly, is desegregation per dollar: the rating system puts a premium on those plans which will achieve the most "effective net reduction in minority group isolation," 45 C.F.R. § 185.14. An applicant which has ceased its active segregation and has alleviated the effects of its prior misconduct could not, under these guidelines, hope to be awarded an ESAA grant, since the net effective reduction would be zero.
 
 
 49
 Realistically, HEW's contention would abolish the waiver provision from the program. An applicant ineligible for participation by virtue of discriminatory activity antecedent to 1972 could only obtain ESAA funding through a waiver of ineligibility; such a waiver would be granted only if the applicant had already been so successful in ameliorating minority group isolation that it could no longer competitively qualify for ESAA benefits. We would not attribute such an absurd intention to the drafters of ESAA. See Bird v. United States, 187 U.S. 118, 224, 23 S.Ct. 42, 47 L.Ed. 100 (1902); Platt v. Union Pacific R. R. Co., 99 U.S. 48, 58, 25 L.Ed. 424 (1878); United States v. Blasius, 397 F.2d 203, 207 n.9 (2d Cir. 1968).
 
 
 50
 Finally, we think that HEW's understanding of the requirements of the waiver statute is in conflict with other significant features of the legislation, specifically the qualification that local boards seeking ESAA funding be currently undergoing desegregation pursuant to either a mandatory or voluntary plan. 20 U.S.C. § 1605(a)(1). The existence of such a plan, which is a condition of eligibility for waiver applicants as well as others, surely implies that the effects of prior discrimination or minority group isolation still persist. Thus, to require that a waiver candidate have already remedied these effects, which is the objective of the integration plan it is required to be presently effectuating, is contradictory and does not comport with the statutory scheme considered as a whole. United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938).
 
 
 51
 Thus, the language of the statute, its legislative history, and its internal logic lead us to conclude that section 1605(d)(1) does not demand, as a prerequisite, that a waiver applicant have previously eradicated the effects of prior discrimination.[11]
 
 IV.
 THE IMPLEMENTING REGULATION
 
 52
 Alternatively, appellants argue that wholly apart from the dictates of the statute, the pertinent regulation promulgated thereunder, 45 C.F.R. § 185.44(d) (3), sets forth a legal duty on the part of waiver applicants to rectify the effects of prior discrimination in teacher assignments. HEW contends that the regulation is "legislative" rather than merely interpretive, and as such, is binding upon the courts. It is presumed that the provision must be read in the manner suggested by the appellant. We disagree on all points.
 
 
 53
 Recent opinions of the Supreme Court, see, e. g., Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 1717-1725, 60 L.Ed.2d 208 (1979); Batterton v. Francis, 432 U.S. 416, 424-26, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); General Electric Co. v. Gilbert, 429 U.S. 125, 140-45, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), and the enactment of Section 4 of The Administrative Procedure Act, 5 U.S.C. § 553, have reinforced the distinction first enunciated in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), between legislative and interpretive regulations. The former are issued pursuant to a lawful, express delegation of authority from Congress to the administrative agency to formulate rules having the force or effect of law. As the primary source of legal obligation, they are entitled "to more than mere deference or weight," Batterton v. Francis, supra, 432 U.S. at 426, 97 S.Ct. 2399, 2406, they are subject to judicial revision only if they are promulgated in excess of the granted power or in contravention of proper procedure, or are utterly capricious and arbitrary. Interpretive rules are administrative regulations issued pursuant to a lesser degree of delegated authority, and in such cases the statute remains the basis for the imposition of liability. The deference which interpretive regulations are accorded depends on such factors as the circumstances of their promulgation, the consistency with which the agency has adhered to the position announced, the evident consideration which has gone into its formulation and the nature of the agency's expertise. Batterton v. Francis, supra, 432 U.S. at 425 n.9, 97 S.Ct. at n.9; Skidmore v. Swift & Co., supra, 323 U.S. at 140, 65 S.Ct. 161.
 
 
 54
 Thus, legislative rules are reviewed only in terms of validity, while interpretive rules are considered in the more expansive light of their reasonableness, or their rational relationship to their statute's objective. The dividing line is found in the nature of the delegation: always, the question is whether Congress intended to confer upon the agency the power to issue rules having the force and effect of law. See, e. g., National Nutritional Foods Association v. Weinberger, 512 F.2d 688, 696-97 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed. 445 (1975); see also Joseph v. United States Civil Service Commission, 180 U.S.App.D.C. 281, 293-295, 554 F.2d 1140, 1152-54 (D.C.Cir.1977).
 
 
 55
 The grant of rulemaking authority involved herein is set forth in 20 U.S.C. § 1605(d)(1), which empowers the Secretary to require in the waiver application such information as may be deemed necessary to the decision, and in section 1605(d)(5) which provides:
 
 
 56
 All determinations pursuant to this subsection shall be carried out in accordance with criteria and investigative procedures established by regulations of the Secretary for the purpose of compliance with this subsection.
 
 
 57
 This delegation of authority is hardly of the same order as that found in Batterton v. Francis, supra (definition of "unemployed" in 42 U.S.C. § 607(a) to be determined "in accordance with standards prescribed by the Secretary"). The grant here is simply a procedural assurance that decisions will be made on the basis of standards publicly elaborated by the Secretary: it does not expressly indicate that those standards themselves shall have the force and effect of law.
 
 
 58
 Furthermore, the regulation in issue lacks the hallmarks of a legislative rule. Appellants do not assert that it was promulgated in compliance with 5 U.S.C. § 553, requiring notice and opportunity for written comments. Also, HEW has never before asserted that the regulation is of the legislative variety, and the District of Columbia Circuit, in its review of a forerunner provision, proceeded on the implicit assumption, apparently without the agency's objection, that it was an interpretive rule only. Kelsey v. Weinberger, supra.
 
 
 59
 Having reached this conclusion, we need say little more about 45 C.F.R. § 185.44(d)(3). Insofar as it has been interpreted to require a waiver applicant to prove that the effects of past discriminatory teacher assignments have been remedied, it is invalid as not being rationally related to the objectives of the ESAA program. Moreover, to the extent that its administrative construction reflects upon Congress' intent, it tends to discredit appellant's position, since the Secretary previously understood a predecessor provision not to require the eradication of discriminatory effects, and the present regulation and its interpretation have only recently been adopted,[12] see Califano II, supra, 464 F.Supp. at 1122-24.
 
 
 60
 In light of the foregoing conclusion, we need not reach the question of whether HEW's interpretation of the regulation as requiring immediate and complete remedy of the effects of past misconduct is correct. Although an administrative agency's construction of its own regulation is normally binding upon a reviewing court, United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), we note that the interpretation espoused by the Secretary is in no way compelled by the plain language of the regulation.[13] Our reservations are further heightened by the fact that companion provisions explicitly require the amelioration of the effects of prior discrimination, see, e. g., 45 C.F.R. § 185.44(f), and consequently, it is at least arguable that the Secretary deliberately omitted such a condition from the regulation at issue in recognition of the fact that teachers' rights are often established by contract and are not amenable to overnight change.
 
 V.
 OTHER CLAIMS
 
 61
 Finally, appellants contend that the district court abused its discretion in issuing a "preliminary injunction." In particular, HEW complains that Judge Weinstein failed to elaborate the requisite findings of fact, and alleges that he reached erroneous conclusions with respect to the irreparable injury and probable success on the merits requirements of the preliminary injunction test. Selchow & Righter Co. v. McGraw Hill Books Co., 580 F.2d 25, 27 (2d Cir. 1978); Treibwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1358 (2d Cir. 1976).
 
 
 62
 A cursory review of the record below plainly reveals that what is before this Court is an appeal from the grant of a permanent injunction following an expedited trial on the merits held in accordance with Rule 65(a)(2), Fed.R.Civ.P. The relief ordered following that proceeding has not yet been entered as a final judgment since the court below is awaiting the results of the administrative remand. Nonetheless, there is no doubt that Judge Weinstein has gone beyond the issuance of a provisional remedy, and has, following a plenary proceeding concerning which appellant had notice and full opportunity to adduce evidence, found in favor of the Central Board and granted the appropriate equitable relief. Under these circumstances, procedural and substantive standards relating to the issuance of preliminary injunctions simply have no application.
 
 
 63
 The order of the district court is, in all respects, affirmed. The matter is remanded to the Secretary for further proceedings not inconsistent with this opinion.
 
 OAKES, Circuit Judge (dissenting):
 
 64
 The majority has gone out of its way to invalidate a regulation of an administrative agency as contrary to congressional mandate. But when one looks at the regulation itself, 45 C.F.R. § 185.44(d)(3), one finds that it does not say what the majority says it says, or what the majority says the agency says it says, but something else. And if the regulation is compared to the underlying statute, it becomes clear that Congress quite expressly authorized, as it so often does, the agency to use its discretion in devising regulations to implement the congressional mandate. I accordingly dissent. I think it serious business and a serious matter of judicial interference with the executive branch of the federal government so lightly to overturn an administrative regulation.
 
 
 65
 What this case involves is a city school system which has been found ineligible for Emergency School Aid Act (ESAA) funds for the school year 1978-79 because of discrimination inter alia in the hiring and in the assignment of full-time teachers, principals, and assistant principals to schools in such a manner as to identify certain schools as intended for a particular race or ethnic group.[1] The school system sought a waiver of ineligibility pursuant to 20 U.S.C. § 1605(d)[2] and 45 C.F.R. § 185.44(d) (3).[3] The reasons given for the denial of the waiver by then HEW Secretary Califano to Chancellor Macchiarola are in pertinent part set forth in the margin.[4] The accompanying report of Mr. Tatel of the Office for Civil Rights is also in pertinent part set forth.[5] Neither the letter denying the waiver, the report accompanying it, nor the regulation under which the denial is made and which the report mentions refer in any place whatsoever to the "effects" of past discrimination, a straw man set up in the majority opinion and the opinion below, aided to some extent however by the federal government's arguments in this litigation.
 
 
 66
 In fact, the denial of the waiver was based on a failure "to remedy the discrimination in the hiring and assignment of minority administrators and teachers." Letter from Secretary Califano, supra note 4. This omission was accompanied by a failure to submit "information or evidence to demonstrate that the discrimination in hiring and assigning minority administrators and teachers has been or will be corrected prior to the commencement of the school year in September 1978." Report of David S. Tatel, Office for Civil Rights, supra note 5.
 
 
 67
 The Central Board evidently thinks and the majority implicitly holds that the entry by the Central Board into the Memorandum of Understanding of September 7, 1977, with its phased remedial plan, see Caulfield v. Board of Education, 583 F.2d 605 (2d Cir. 1978), may be enough in and of itself to restore its eligibility for ESAA funds and permit the granting of a waiver. To my mind, the Secretary's determination to the contrary was within his own Department's regulations[6] and the regulations, thus applied, conform to the statute.[7] Rather than deciding these issues as they are presented here, the majority deals exclusively with the hypothetical questions whether a waiver must, under the regulations, be preceded by the elimination of all the effects of past discrimination and whether, if so, the regulations are valid under the statute. The determinations arrived at are therefore unwarranted in the present context.
 
 
 68
 Let me be more precise. There are several ways in which a school district may, under 20 U.S.C. § 1605(d), discriminate and render itself ineligible for ESAA funds. It may aid segregated private schools, discriminate in its dealings with staff, segregate children within a school for a significant portion of the day, or take other actions, "such as limiting curricular or extracurricular activities," that discriminate among children on the basis of race or ethnic origin. Id. § 1605(d)(1). Before a waiver is granted, the Secretary must ensure that any such "practice, policy, or procedure, or other activity resulting in the ineligibility" has ceased to exist or occur and will not reoccur. Id.
 
 
 69
 The New York City Central Board had engaged in several of the disqualifying violations enumerated in the statute and regulations. It was violating § 1605(d)(1)(B) (demotion or dismissal of minority group personnel) and § 1605(d) (1)(D) (imposing disciplinary sanctions against children in a discriminatory way), as well as teacher and administrator assignment provisions of § 1605(d) (1)(B). But the ESAA funds were denied only because of a failure to correct the discriminatory assignment of teachers and administrators. HEW took this action because its regulation requires that, prior to any waiver, "the proportion of minority group full-time classroom teachers at each school (be) between 75 per centum and 125 per centum of the proportion of such minority group teachers which exists on the faculty as a whole." 45 C.F.R. § 185.44(d)(3). This provision is similar to the other waiver regulations, which generally require that the disqualifying violation be corrected prior to a waiver, although there is provision for a gradual remedy when the violation is disproportionate dismissal or demotion of personnel. Id. § 185.44(d)(1)(i).
 
 
 70
 Clearly, HEW correctly applied its regulation, because the district had failed to alter its teacher assignments in any way. The Memorandum of Understanding that was entered into on September 7, 1977, which was to provide a phased remedial plan, did not, in itself, effect any change at all. It was not even aimed at obtaining ESAA funds. As the opinion in Caulfield v. Board of Education, 583 F.2d 605, 607-10 (2d Cir. 1978), discussing that Memorandum makes very clear, it was aimed at securing compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-6, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1686.[8] Because the City Board had to come to terms with the teachers' union, perhaps for other reasons, all of which are immaterial here, the compliance by it was to be phased in so as "to remedy the discriminatory effect of those practices on a phased basis by 1980." Caulfield, supra, 583 F.2d at 607.
 
 
 71
 Thus, what the majority does now is to deny HEW's power to implement the statute by the present regulations. It does so by imagining an entirely different regulation one requiring the prior eradication of all the lingering, indirect effects of past discrimination and concluding that such a rule is undesirable because effects of discrimination may last "for a generation, or longer." Majority opinion at 611. The majority also makes one more fundamental error in its reading of the statute. It suggests, majority opinion at 612, that segregation of children within a district as a whole is a violation that may disqualify a district. It goes on to conclude that, under its existing regulations, HEW would grant a waiver only to districts that have already fully desegregated i. e., districts that no longer really need the money. Id. This result would indeed be somewhat absurd, but the structure of the Act as a whole makes it clear that funds may be granted to districts that are still implementing plans for desegregating student bodies, see 20 U.S.C. § 1605(a)(1), and that existing school segregation itself was not intended as a violation that would cause ineligibility, see id. § 1605(d)(1) (listing violations). Referring to the list of disqualifying violations, then Senator Mondale stated: "The application of these safeguards is crucial. The value of integrated education to the children involved in the programs under this act will be lost if discrimination continues to be practiced within schools which are desegregated." 117 Cong.Rec. 10758 (1971) (emphasis added). The violations are thus discrete actions, other than segregation of students itself, that may take place in the context of an overall process of school desegregation.
 
 
 72
 This conclusion fits well with the overall statutory scheme. ESAA, as Califano I attempted to point out, 584 F.2d at 578-81, is a special funding act, supplementing an eligible nondiscriminatory school district's funds "to aid in desegregating schools and support quality integrated schools." S.Rep.No.604, 92d Cong., 2d Sess. (1972), reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 2595, 2600. These funds, which are limited in amount in any given school year in accordance with congressionally set national priorities, are in effect awarded on a competitive, "merit," point-award basis to those school districts that have demonstrated eligibility by "objective criteria," Califano I, supra, 584 F.2d at 579 n. 4. Funds are awarded "to qualified applicants in the order in which their applications are ranked." Id. at 579. Congress was extremely careful to make sure that the requirements were uniform nationwide irrespective of the type of discrimination practiced, de facto or de jure. Id. at 578 n. 3. The Act was thus both a carrot and a stick, to North and South alike, affirmatively promoting the policies of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).
 
 
 73
 The Act specifically set forth strict criteria for the award of funds, in the words of Senator Mondale, "strong safeguards," "administrative guidelines," and "mandatory directions"[9] to try to assure proper administration of the Act. And Congress was very specific in its waiver provisions to provide nondelegable approval only by the Secretary himself, 20 U.S.C. § 1605(d)(2),[10] with a grant to be made only "upon determination that any practice, policy, procedure or other activity resulting in ineligibility has ceased to exist . . . ," id. at § 1605(d)(3), and with his determination to be "carried out in accordance with criteria and investigative procedures established by regulations of the Secretary for the purpose of compliance with this subsection." Id. at § 1605(d)(5). To suggest, as the majority opinion does, that the grant of power here is "simply a procedural assurance," majority opinion at 24, and that the regulation here in question, 25 C.F.R. § 185.44(d) (3), is not "rationally related to the objectives of the ESAA program," majority opinion at 24, is to usurp the agency's functions.
 
 
 74
 To give the majority their due, I do not believe that a regulation adopting their view would necessarily be invalid, but see Kelsey v. Weinberger, 162 U.S.App.D.C. 159, 498 F.2d 701 (D.C.Cir.1974), despite the apparently clear statutory requirement that the practice of assigning teachers to racially identifiable schools cease to exist or occur prior to a waiver. See 20 U.S.C. § 1605(d)(1). HEW should have, and I believe was given by Congress, certain flexibility in this area. In addition, there is a certain ambiguity in the statute created by the fact that faculty segregation is included both in § 1605(a), which discusses the kinds of ongoing desegregation that the Act seeks to encourage through funding, and in § 1605(d)(1), which, as I have noted, lists various practices that, until corrected, disqualify a district from receiving funds to aid its overall desegregation effort. Faced with this apparent contradiction, the administering agency might reasonably conclude that faculties need not be desegregated before a waiver is granted. But it might also conclude that the process of faculty desegregation, unlike that of student desegregation, is, because of § 1605(d)(1), only intended to be funded after the remedy has been substantially effected. A situation of such apparent ambiguity is, it seems to me clearly one where deference to the HEW interpretation is warranted, indeed required, regardless of whether the regulations are deemed "interpretive" or "legislative." See generally Batterton v. Francis, 432 U.S. 416, 424-26, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). When two interpretations are possible, and neither would frustrate the legislative scheme, we should follow the agency's interpretation.
 
 
 75
 The majority opinion ultimately fails to state what HEW may now do. It may be that the majority's invalidation of the statute means that HEW must now grant the waiver, because the Memorandum is a sufficient indication that the district will no longer discriminate. If so, I am concerned about how today's decision will affect future school desegregation.
 
 
 76
 Presumably the Department will be reluctant to enter into memoranda of understanding similar to the one entered into here, providing for phased-in compliance, lest agreement thereto immediately render eligible for ESAA funds, on the basis of its "good intentions," a district that has highly segregated faculty assignments. This would be a sorry combination of events since there is a statutory admonition to all federal agencies under the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1, to secure voluntary compliance with that Act's provisions. And, while I agree with the majority in that I do not believe Congress necessarily meant defiant applicants to do "an additional penance," majority opinion at 610, I do believe that Congress knows as well as any other branch of government with what the road to Hell is paved. I think Congress was perfectly prepared to permit the Department under Department regulations to insist upon a little more from its ESAA applicants than the paving stones the majority relies on here.
 
 
 77
 If, on the other hand, under the majority opinion and "remand" HEW still has some power to deny the waiver sought by appellee a power based on the statutory requirement that the Secretary ensure that the discrimination has ceased it is unclear how the majority decision has altered the status quo under the regulations. Such a power is no more and no less than what the regulations have embodied all along the power to make sure that teachers are no longer assigned to schools on the basis of race or ethnic origin.
 
 
 78
 But perhaps the majority has yet a third view. Maybe it feels that HEW can require more than a Memorandum of Understanding, but less than a real change in teacher assignments. If so, that view is nowhere spelled out or explained. The opinion, where light is needed, creates only fog or, if under the first alternative suggested it requires the agency to treat the mere entering into the Memorandum of Understanding as sufficient to constitute compliance, darkness. I therefore dissent.
 
 ORDER ON PETITION FOR REHEARING
 MESKILL, Circuit Judge:
 
 79
 The government, in its brief, contends that our opinion is inconsistent with the subsequent Supreme Court decision in Board of Education of the City School District of New York v. Harris, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979). Not only do we think our decision is not inconsistent with the Court's decision, we think it is in fact supported by the language of that opinion.
 
 
 80
 The government contends that we had construed the statute as requiring the application of an intentional (discrimination) standard while the Court held that the Act was intended to apply to de facto as well as de jure discrimination. For the same reason the amicus brief argues that we improperly relied upon the Memorandum of Understanding's compliance with Title VI of the Civil Rights Act of 1964. Both briefs simply overlook what we decided. We explicitly stated that ESAA insists "on a single national standard for the distribution of these federal funds," citing to Section 1602(b) of 20 U.S.C. which provides:
 
 
 81
 It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 and section 182 of the Elementary and Secondary Education Amendments of 1966 shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race whether de jure or de facto in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.
 
 
 82
 At 611 and at n.10. We did not distinguish between intentional and nonintentional discrimination, but rather, between the maintenance of either form of discrimination and a policy of elimination of either form of discrimination:
 
 
 83
 What must cease to exist or occur in order for an applicant to qualify for a waiver of ineligibility is its current acceptance of the status quo. It would seem therefore, that if the Central Board has adopted a policy of eliminating discrimination in a manner approved by HEW, as demonstrated by its commitment to the Memorandum of Understanding, then "practices," "procedures" and "other activities," undertaken in furtherance of that policy cannot logically be described as having resulted in the ineligibility.
 
 
 84
 At 609.
 
 
 85
 The government and the amicus briefs argue that we overlooked the portion of legislative history referred to in the Supreme Court's opinion, 444 U.S. at 148 and n.12; 100 S.Ct. at 373 and n.12. Although referred to by the Court as having "some significance," the Court does not indicate in what manner it would affect the construction of the waiver-of-ineligibility provisions. Indeed, the Court's statement, a few paragraphs later, that ". . . ESAA funds are available for the furtherance of a plan to combat de facto segregation," 444 U.S. at 150, 100 S.Ct. at 374 (emphasis added), indicates that, whatever the significance of this legislative history, our construction of the waiver-of-ineligibility provision comports with the Court's perception of the objectives of the statute.
 
 
 86
 For these reasons we do not think a different result is mandated by the subsequent Supreme Court opinion in Board of Education of the City School District of New York v. Harris, supra.
 
 Petition for rehearing is denied.[1]
 
 87
 A petition for rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the Appellants, and a poll of the active judges having been taken, and a majority thereof having voted against rehearing en banc,
 
 Upon consideration thereof, it is
 
 88
 Ordered that said petition be and it hereby is DENIED.
 
 
 89
 Circuit Judges OAKES, NEWMAN, and KEARSE voted in favor of rehearing en banc.
 
 
 
 *
 Honorable Charles E. Stewart, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 At the time this case was argued, Joseph A. Califano, Jr. was the Secretary of the Department of Health, Education and Welfare. Prior to the filing of this opinion, however, he had been replaced by Patricia Harris, who has been substituted as an appellant herein pursuant to Rule 43(c)(1), Fed.R.App.P
 
 
 [2]
 The version of the Emergency School Aid Act ("ESAA") governing this case was repealed, effective September 30, 1979, through passage of the Education Amendments Act of 1978, Pub.L. 95-561, Title VI, 92 Stat. 2252, et seq. ESAA has been substantially reenacted thereunder, with some modifications not relevant to the matters presented on this appeal, and has been codified at 20 U.S.C. §§ 3191-3207. Section 1605(d) of the old act, which is at issue herein, corresponds to newly adopted section 3196(c)
 
 
 [3]
 See also, Board of Education of the City School District of the City of New York v. Califano, 584 F.2d 576, 578 n. 3 (2d Cir. 1978), cert. granted, 440 U.S. 905, 99 S.Ct. 1211, 59 L.Ed.2d 453 (1979) ("Califano I "), quoting Conf.Rep.No. 798, 92d Cong., 2d Sess. (1972): "The House amendment stated the purpose of the title as providing financial assistance to meet the special needs incident to desegregation and to encourage voluntary integration. . . . The conference substitute retains the House provision . . . ." And see, H.Rep.No.92-576 at 4, 92d Cong., 1st Sess. (1971) ("Most school districts, however, are pressed to meet ordinary expenses. They are in no position to incur the added expense of achieving successful integration."); 118 Cong.Rec. 18438-9, 92d Cong., 2d Sess. (1972) (remarks of Sen. Pell). To similar effect were the remarks of Senator Javits, describing the mission of the bill as providing federal funding to offset the "added costs of special programs and staff required for effective desegregation and for meaningful efforts to reduce, eliminate or prevent the isolation of minority group children" and "to bring about better quality education," 116 Cong.Rec. 44410, 91st Cong., 2d Sess. (1970)
 
 
 [4]
 Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title IX of the Education Amendments of 1972 similarly prohibits discrimination in federally assisted programs on the basis of sex. 20 U.S.C. § 1681
 Only the racially discriminatory system of teacher assignments is currently before this Court. As to this violation, HEW's November, 1976, letter stated that "The New York City school system . . . has, on the basis of race and national origin . . . assigned teachers, assistant principals and principals in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools . . . ."
 
 
 [5]
 Other claims advanced by the Caulfield plaintiffs were recently rejected by the district court in Caulfield v. New York City Board of Education, 486 F.Supp. 862 (E.D.N.Y. 1979) (Weinstein, J.)
 
 
 [6]
 For the same reason, the related notion of exhaustion of administrative remedies is not appropriate to these circumstances. See Touche Ross & Co. v. SEC, 609 F.2d 570, 574-576 (2d Cir. 1979); cf. McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)
 
 
 [7]
 An estoppel in this circumstance would require a misrepresentation by an agent of the federal government made within the scope of his authority, which was justifiably relied upon by the appellee to its detriment thereby making the denial of equitable relief unconscionable, see generally New York Athletic Supply Co., Inc. v. United States, 450 F.Supp. 469, 471 (S.D.N.Y.1978); Tonkonogy v. United States, 417 F.Supp. 78, 79 (S.D.N.Y.1976)
 We cannot say with complete certainty that the expressed quid pro quo for implementing the agreement was the Central Board's immediate acceptance into the ESAA program, although such was the apparent expectation. Moreover, we would not eagerly hold that the Central Board suffered a detriment by reforming a practice which, although not necessarily unconstitutional, was sufficiently improper as to disqualify it from federal assistance under the Civil Rights Act of 1964, 42 U.S.C. § 2000d.
 
 
 [8]
 See 117 Cong.Rec. 511-12, 92d Cong., 1st Sess. (1971) (remarks of Rep. Bell); Hearings on H.R. 17846 before the General Subcommittee on Education of the House Committee on Education and Labor, p. 570, 91st Cong., 2d Sess. (1970); Hearings on S. 3883 before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, pp. 94-97, 91st Cong., 2d Sess. (1970)
 
 
 [9]
 The Emergency School Assistance Program, Pub.L. 91-380, 84 Stat. 800 (1970)
 
 
 [10]
 Section 1602(b) of 20 U.S.C. provides:
 It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 and section 182 of the Elementary and Secondary Education Amendments of 1966 shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race whether de jure or de facto in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.
 
 
 [11]
 The result reached today is not necessarily incompatible with the holding in Kelsey v. Weinberger, 162 U.S.App.D.C. 159, 498 F.2d 701 (D.C.Cir.1974). There, the predecessor regulation to the current 45 C.F.R. § 185.44(d)(3) was held to be invalid insofar as it permitted a waiver to be granted to school districts which had suffered from racially motivated teacher assignments, and which warranted to remedy the practice only through a gradual and virtually open-ended process of attrition. Fearing that this offended constitutional prohibitions against the federal funding of discriminatory activities, the Court deemed the regulation to be contrary to the statute
 In our view, the requirement in the present regulation that the waiver candidate be proceeding in accordance with an HEW-approved plan which will achieve its goal in a reasonable period of time is sufficient to allay the concerns, both statutory and constitutional, expressed by the court in Kelsey, supra. To the extent that the cases are not distinguishable on their facts, we are in substantial agreement with the position taken by Judge Weinstein in declining to adopt the constitutional analysis of the District of Columbia Circuit Court. Califano II, supra, 464 F.Supp. at 1125-26.
 
 
 [12]
 The district court has aptly set forth the chronology as follows:
 The original text of the regulation was identical to its present language. . . . On July 16, 1973, the Secretary of HEW in a notice of proposed rulemaking announced a modification of the regulation to permit waivers of ineligibility for school districts which had not yet fully rectified the effects of the past discriminatory practices in teacher assignments. 39 Fed.Reg. 18894 (1973)
 Responding to criticism that the modified regulation conflicted with the statutory standards, the Secretary cogently argued that section 1605(d)(1) did not require as a condition for granting a waiver the elimination of all effects of past discriminatory practices. He pointed out that the elimination of the active practice and the adoption of a plan to eliminate the effects satisfied the statutory standard . . . .
 The present language of the regulation conflicting with the Secretary's interpretation was adopted by HEW only after the Court of Appeals for the District of Columbia, in Kelsey v. Weinberger, (498) F.2d 701 (1974), held the then existing regulation invalid.
 Califano II, supra, 464 F.Supp. at 1122-24. See also 38 Fed.Reg. 18899, 21646 (1973); 40 Fed.Reg. 14167 (1975).
 
 
 [13]
 In full, text, the regulation provides:
 In the case of ineligibility resulting from discriminatory assignment of teachers as prohibited by § 185.43(b)(2), such applications for waiver shall contain evidence that such agency has assigned its full-time classroom teachers to its schools so that no school is identified as intended for students of a particular race, color, or national origin. Such nondiscriminatory assignments shall, in the case of a local educational agency implementing a plan described in § 185.11(a), conform to the requirements of such plan with respect to the assignment of faculty. In the case of local educational agencies not implementing such a plan, or implementing such a plan which contains no provision as to assignment of faculty, such assignments shall be made so that the proportion of minority group full-time classroom teachers at each school is between 75 per centum and 125 per centum of the proportion of such minority group teachers which exists on the faculty as a whole.
 
 
 [45]
 C.F.R. § 185.44(d)(3)
 
 
 [1]
 This ineligibility was mandated by 20 U.S.C. § 1605(d)(1)(B) and 45 C.F.R. § 185.43(b)(2). See Board of Educ. v. Califano, 584 F.2d 576, 588 (2d Cir. 1978), cert. granted, 440 U.S. 905, 99 S.Ct. 1211, 59 L.Ed.2d 453 (1979) (Califano I ). Califano I dealt with ESAA funds for the school year 1977-78
 
 
 [2]
 The statute provides that
 (n)o educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972 (engaged in certain discriminatory practices) except that, in the case of any local educational agency which is ineligible for assistance (for this reason), such agency may make application for a waiver of ineligibility, which application shall specify the reason for its ineligibility, contain such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur and include such provisions as are necessary to insure that such activities do not reoccur after the submission of the application.
 20 U.S.C. § 1605(d)(1).
 
 
 [3]
 This regulation is quoted in full in note 13 of the majority opinion
 
 
 [4]
 The Secretary stated:
 On June 20, 1978, Dr. Herman R. Goldberg, Associate Commissioner, Equal Educational Opportunity Programs, Office of Education, notified you that your district was ineligible for assistance. This notification was a consequence of your district's failure to meet the requirements for eligibility established by section 706(d) of the Act and sections 185.43(b)(2), 185.43(d)(4), and 185.43(d)(5) of the implementing regulations. Your school district has provided acceptable plans to remedy the discrimination in the assignment of students to racially identifiable or isolated regular classes and in imposing disciplinary sanctions. Nevertheless, your district has failed to remedy the discrimination in the hiring and assignment of minority administrators and teachers.
 Your district applied for a waiver of ineligibility on July 7, 1978. However, it failed to provide evidence that the discrimination in the hiring and assignment of minority administrators and teachers had ceased to exist and would not reoccur.
 The grounds for my decision to deny your application are set forth in the enclosed report from Mr. David S. Tatel, Director of this Department's Office for Civil Rights. From this report I have determined that your school district has not corrected the violation of section 185.43(b)(2) of the ESAA
 Letter from Secretary Califano to Chancellor Macchiarola (Sept. 28, 1978).
 
 
 [5]
 The report stated:
 On September 7, 1977, the Central Board and OCR entered into a Memorandum of Understanding that would have remedied the discrimination in hiring and assignment of minority administrators and teachers by 1980. Because the Memorandum of Understanding provided for a phased remedial plan that would not have eliminated the discrimination in hiring and assigning minority administrators and teachers by September 1977, the Department denied the Central Board's request for an ESAA waiver of ineligibility for the 1977-78 funding cycle. Furthermore, the Central Board subsequently abandoned the terms of the Memorandum of Understanding after Judge Weinstein invalidated the agreement on procedural grounds in Caulfield v. Board of Education, (449 F.Supp. 1203) (E.D.N.Y. 1978), appeal pending, (583 F.2d 605) (2d Cir. 1978).
 On July 7, 1978, the Central Board applied for a waiver of ineligibility based on its pending appeal of Judge Weinstein's decision in Board of Education v. Califano, No. 77-C-1928 (E.D.N.Y. April 18, 1978), upholding the Department's denial of ESAA funds to the Central Board for 1977-78. The Central Board offered no explanation why the pending of the appeal would justify granting an ESAA waiver of ineligibility. More significantly, on August 21, 1978, the United States Court of Appeals for the Second Circuit affirmed Judge Weinstein's decision. Board of Education v. Califano, (584 F.2d 576) No. 78-6083, 78-6088, 78-8180 (2d Cir. Aug. 21, 1978).
 The Central Board has submitted no information or evidence to demonstrate that the discrimination in hiring and assigning minority administrators and teachers has been or will be corrected prior to the commencement of the school year in September 1978. Therefore, the Central Board is not eligible for an ESAA waiver of ineligibility on this issue.
 Report by David S. Tatel, Office for Civil Rights.
 
 
 [6]
 See 45 C.F.R. § 185.44(d)(3), quoted in majority opinion, note 13 supra ; 45 C.F.R. § 185.44(b) ("An application for waiver . . . shall contain such information and assurances as will insure that any practice, policy, procedure, or other activity resulting in ineligibility has ceased to exist or occur, and shall include such provisions as are necessary to insure that such practice, policy, procedure, or activity will not reoccur after the submission of such application.")
 
 
 [7]
 20 U.S.C. § 1605(d)
 
 
 [8]
 Title IX deals with practices discriminatory against females. The Title VI violations involved discriminatory teacher selection and testing procedures and racially identifiable employment pools as well as teacher and administrator assignments reinforcing racial/ethnic identifiability (also, concededly, involved in the instant case) and assignment of less experienced, lower salaried, less qualified teachers to minority-preponderant schools. Caulfield v. Board of Educ., 583 F.2d 605, 608 n. 3 (2d Cir. 1978)
 
 
 [9]
 117 Cong.Rec. 10758 (1971). The Senator stated:
 It is because of the history of the emergency school assistance program that the Labor Committee has included in the bill strong safeguards modeled upon those added in the Senate to the emergency school assistance program appropriation. The committee has also, both in the bill and the report set forth mandatory directions to the Commissioner to try to assure proper administration of this program.
 
 
 [10]
 All waivers must also be in writing, with prior notice given to specific congressional committees, 20 U.S.C. § 1605(d)(6). These extraordinary requirements to me demonstrate that Congress was extremely fearful that waivers would be granted too quickly or easily
 
 
 [1]
 Judge Oakes adheres to his previous view